BROWN v. SMITH.

(Circuit Court, D. South Carolina. May 27, 1901.)

1. SPECIFIC PERFORMANCE—CONTRACTS ENFORCEABLE—ENTIRE CONTRACT FOR SALE OF REALTY AND PERSONALTY.

A contract for the sale of a plantation as a going concern, including stock, implements, and supplies, for a fixed sum, may be specifically enforced in equity as an entirety.

2. VENDOR AND PURCHASER—RESCISSION OF CONTRACT BY PURCHASER—MISREPRESENTATIONS.

One who contracts for the purchase of real estate in reliance on the representations and statements of the vendor as to its character and value. but after he has visited and examined it for himself, and has had the means and opportunity of verifying such statements, cannot avoid the contract on the ground that they were false or exaggerated.

In Equity. Suit for specific performance of contract.

G. W. Croft & Son, for complainant.

Messrs. Henderson, for defendant.

SIMONTON, Circuit Judge. This is an action for specific performance of a contract for the sale of land. The action was orig-

inally brought in the court of common pleas of South Carolina, sitting in the county of Aiken, and it has been regularly removed into this court. The plaintiff, Pinckney Brown, was in possession of a plantation known as "Belfast," situate in the county of Barnwell, S. C., claiming to own the fee therein. The defendant, Edward L. Smith, is a citizen of the state of New York, temporarily residing in Aiken, S. C. Mr. Smith is known to be a man fond of field sports, hunting and bird shooting, and is supposed to be a man of fortune. Mr. Brown became desirous of selling his plantation, and of removing to Aiken, for the purpose of completing the education of his children, and of giving them more enlarged social advantages. To this end approaches were made by him and at his instance to Mr. Smith to visit the plantation, and to observe its advantages for hunting and fishing, which finally resulted in a visit by Mr. Smith. He spent a day or two on the plantation, shot over it for birds, and went upon the pond and creeks connected with it seeking for ducks. Apparently he was pleased with what he saw, and a few days afterwards, at an interview with each other, they discussed the sale of the plantation and its price. Brown proposed to sell the place as a whole,—the land, agricultural implements, stock, cotton seed, and provisions on the place, in fact, the entire plantation as a whole and a going concern,—for the price of $24,000. After some trading, he reduced his price to $19,000. They then went to the office of the Messrs. Henderson, who were the attorneys of Mr. Smith, and there a written contract was prepared by Mr. Henderson, and executed by both parties. As this agreement is the foundation of this case, it is set out in full:

"That, in consideration of the sum of nineteen thousand dollars ($19,000.00), paid and to be paid as hereinafter set forth, said Brown agrees to convey by proper deed to said Smith the certain plantation or tract of land known as the 'Belfast Plantation' of said Brown, situate in Barnwell county, South Carolina, containing thirty-nine hundred and ninety-seven (3,997) acres, as shown by blue-print plat hereto attached; also eight head of mules, one horse, and all live stock on place; all farm implements on place; four (4) double-team wagons; one new single wagon; all harness of every kind on place; about 1,500 bushels of corn, being all on the place; all fodder, hay, pea and pea vines, and cotton seed on place; all personal property on place, excepting the baled cotton and loose cotton in gin on the place; also the ferry boat. The said Edward Livingston Smith has paid twenty dollars this day upon the price agreed on for above property (the receipt of which is hereby acknowledged), and agrees to pay the balance of said price, to wit, $18,980.00, as soon as possession of said property, real and personal, is delivered to him, and proper deed executed and delivered as hereinbefore agreed, and title approved of."

The next day after the agreement was executed, Mr. Smith visited the plantation, and as soon as he met one Bush, who resided upon it as manager for Mr. Brown, he told him that he had purchased the plantation, and thought that he had made a bargain. During that day he had frequent conversations with Bush, and found that he had obtained an erroneous impression on several points relating to the size, the resources, and the profits of the plantation. He took a memorandum in writing of these points, and when Mr. Brown came to the plantation the next day he produced his memoranda,

and asked an explanation. They then and there discussed these, and finally Mr. Smith said that he thought Brown should reduce his price by $1,000. This Brown refused to do. After some further discussion, it was mutually agreed that the price should be $18,500, instead of $19,000, and, when this was finally settled, Mr. Smith jumped up, and, taking Brown's hand, expressed himself fully satisfied. The plantation had been planted in cotton and watermelons as the market crops, and had upon it a number of tenants, living in houses on the place, and paying rent in kind. Some of the plantation was planted by Mr. Brown himself. There was a supply store on the place, called a "commissary," at which the tenants got their supplies. Mr. Smith, on his visit to the plantation after the execution of the agreement, had seen the tenants, and had told them that he had bought the place, and expected them to continue. He also entered into negotiations with Mr. Bush, the manager, looking to his retention. After the discussion with Mr. Brown last above spoken of, Mr. Smith gave formal notice to Brown that he would not hold himself bound by the agreement, and would treat it as a nullity, at the same time demanding the return of the · $20 paid in advance. Thereupon these proceedings were instituted.

The bill sets out the contract, the circumstances preceding and succeeding it as above stated, the delivery of the control of the plantation to the defendant, and prays specific performance. The answer admits the execution of the contract, and seeks to avoid the same because it was entered into under facts and circumstances, and upon false representations, which induced the defendant to purchase, and which operated as a fraud upon him. The answer sets these out in detail: (1) That said place and the lands connected therewith was 'a magnificent place for a hunting preserve, specially adapted to the sport of duck shooting, and a great resort for ducks in the season; that, after the contract was signed, defendant learned that this was untrue. (2) That, in addition to its excellence as a hunting preserve, the plaintiff had represented that in any good year an income could be realized from the crops on the place of 25 or 30 per cent. on the price asked,—in no year less than 15 per cent.; that in the year 1900 plaintiff had made $3,500 from his melon crop, and that he had 60 bales of cotton from his rent, and that he ran 8 plows with his wage hands,—all of which, after the contract was signed, he found untrue. (3) That plaintiff had represented that the profit from the commissary on the place was from $1,500 to $2,000 per year, and that, after signing the contract, he found that this was untrue. (4) That, before signing the contract, plaintiff had stated that a ferry on the Savannah river, connected with the place, earned him $300 per year, and that he afterwards found this to be untrue. (5) That representations were made as to the forest trees upon the place as in their original condition, never having been cut for timber or timber purposes. After the contract was signed, he discovered this to be untrue, and he also found that the plaintiff had made contracts with third persons, under which they were then actually engaged in cutting timber on the place. (6) That, before signing the con-

tract, defendant had been told by plaintiff that he had refused $16,000 for the place, which statement he found afterwards was false. (7) That, before he had executed the contract, defendant had been informed that there was an excellent set of hands on the place, who worked well, and paid their debts in the way of supplies and advances promptly, and afterwards that he found this representation untrue. (8) That, before he signed the contract, defendant had been informed that Mr. Bush, the manager for Brown, was under contract with him to work for the year 1901 at $600 per annum, and that afterwards he found that this was not true. (9) That, before signing the contract, defendant had been informed by the plaintiff that a large parcel of land adjoining the mill on the land lying near the railroad, and which had on it a pen or barn in which mules were lodged during the melon season, belonged to the place, and that afterwards he found that this was not true. The answer also insisted that the plaintiff had a plain, adequate, and complete remedy at law.

As to the jurisdiction: The contract in this case is for the sale of a plantation, stocked and supplied, a going concern. True, a large part of the contract was for personalty. But this personalty was part and parcel—an essential part—of the plantation. With the land the personalty made the subject-matter of the contract a unit, gave enhanced value to the land; indeed, was inseparable from it as a going concern. When personal property is mingled with an agreement for sale of realty, the court will decree specific performance of the entire contract. Leach v. Forbes, 11 Gray, 506. The remedy at law will hereafter be considered.

As to the alleged misrepresentation: The rule governing this court is laid down in Slaughter v. Gerson, 13 Wall. 379, 20 L. Ed. 627:

"The misrepresentation which will vitiate a contract of sale, and prevent a court of equity from aiding its enforcement, must not only relate to a material matter constituting an inducement to the contract, but it must relate to a matter respecting which the complaining party did not possess at hand the means of knowledge; and it must be a misrepresentation upon which he relied, and by which he was actually misled to his injury. A court of equity will not undertake, any more than a court of law, to relieve a party from the consequences of his own inattention and carelessness. Where the means of knowledge are at hand, and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities he will not be heard to say that he has been deceived by the vendor's misrepresentations. If, having eyes, he will not see matters directly before them, where no concealment is made or attempted, he will not be entitled to favorable consideration when he complains that he has suffered from his own voluntary blindness, and been misled by overconfidence in the statements of another."

The evidence in this case discloses the facts: That the defendant, having been informed of the supposed advantages and merits of plaintiff's plantation as a game reserve, went to it in person, shot over it, and had a full opportunity of seeing what kind of a place it was for ducks. After this personal inspection, he signed the

contract. So much for his first objection. That he accepted all the statements of the plaintiff as to the percentage made on the plantation, the amount made from rents, the number of plows with the wage hands, the profits of the commissary, and the value of the ferry, although he was on the plantation itself, in the room where the books of the plantation were kept, and in full communication with the manager, who showed every disposition to give him all the information he required. There is conflict of testimony on much of this; but, assuming that the defendant's memory is correct, his purpose to tell all the truth cannot be doubted. He gave his confidence to the plaintiff, with the means in his power to test the truth of his statements, when it is remembered, also, that he had his suspicions excited the day after he had signed the contract, and put questions to the plaintiff from memoranda of points of misunderstanding, and after all this reaffirmed his contract, and expressed full satisfaction. It has been shown also in the testimony that the plantation did earn in 1900 some six thousand and odd dollars. The account sales of the melons were produced, and also those of the cotton. Mr. Frost, the factor of plaintiff, testified to the amount of cotton sold by his firm on account of this plantation,—from 100 to 125 bales each year for several years last past. The plaintiff, in his statements, before the contract was signed, represented the profits on his commissary as from $1,500 to $2,000 per year, and he also stated the net income from the ferry to be $300 per year. Both of these were overestimates. But on his last visit to the plantation the defendant has received intimation of these, and they were discussed by him with the plaintiff, and it was after this discussion that he reaffirmed the contract because of the reduction of $500 on the price. The plaintiff represented that the hands on the place were excellent. This seems to be borne out in the testimony of his neighbors and of the hands themselves. One of the misrepresentations charged is that Mr. Bush, the overseer, had contracted to manage for Brown for the year 1901 for $600. It is true that he did so contract with Brown. But he insisted that Smith should pay him more than this. Although Bush was willing to contract with Brown at the rate, he was not bound to carry out this contract with Smith, nor could Brown bind him to do so. It is charged that plaintiff represented to defendant that a large parcel of land near the mill belonged to this place, and that this proved to be false. Yet when he signed the contract of sale he saw a blue print, in which the boundaries of the plantation were distinctly defined, and that blue print is mentioned in the contract, and made a part of it. The most important statement made by the plaintiff was as to the timber on the place, and his omission to state that there was a contract under which certain parties had the right for 10 years to cut timber on a part of the swamp lands. The valuation he put on the timber was an exaggeration, although one witness gives the same estimate. It is charged that a statement made by plaintiff to defendant that he had received an offer of $16,000 for the land itself from

a responsible person is not true. But the explanation of plaintiff is reasonable. He says that a person in Atlanta, wanting a place in the country, had offered to exchange with him lands in that city estimated to be worth at least $16,000 for his land, and that he did not consider the proposal.

Reviewing and considering the testimony, it is manifest that the defendant entered into this contract assuming many things to be true without proper examination, and without using the means of verification at hand. There was no sort of fiduciary relation between him and the plaintiff. They were mere acquaintances, and in their dealings were both on guard, or should have been. He is evidently a gentleman of culture, of intelligence, and experienced in affairs. He is not a ward of the court, and entitled to its special protection. The case comes directly within Slaughter v. Gerson, above quoted, and the defendant must abide by his contract. In Farrar v. Churchill, 135 U. S. 609, 10 Sup. Ct. 771, 34 L. Ed. 246, the court held that, if a purchaser of real estate, to whom representations of the character and value of the property are made by the vendor, visits the property itself prior to the sale, and makes a personal examination of it touching these representations, he will be presumed to rely on his own examination in making the purchase, and not upon the representations of the vendor; and, in the absence of fraud or concealment, cannot have the sale set aside. The case of Development Co. v. Silva is stronger than this. It is in 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678:

"If a purchaser investigate for himself, and nothing is done to prevent his investigation from being as full as he chooses, he cannot say that he relied on the vendor's representations. So, also, in Clapham v. Shillito, 7 Beav. 146. If the means of investigation and verification be at hand, and the attention of the party receiving the representations be drawn to them, the circumstances of the case may be such as to make it incumbent on a court of justice to impute to him knowledge of the result, which, upon due inquiry, he ought to have obtained, and thus the notion of reliance on the representations made to him may be excluded."

The question really is, shall this contract be enforced in this court, or must the parties be left to the action at law? It is clear that the contract cannot be enforced in its entirety. Much of the personal property which was subject-matter of the contract has been used. The plaintiff, it appears, is still carrying on the plantation. There is no evidence at all as to the title,—whether the plaintiff can convey in fee simple, or what is the nature of the trust under which he holds title. There appears no abstract of title, and no deed has been proposed or tendered. Then no evidence exists as to the incumbrances upon the land, or the force and effect of the contract for cutting timber thereon,—how far and to what extent it injures the value of the plantation. All these matters must be settled before the mode of relief can be determined upon. It is ordered that the cause be recommitted to the master; that he take testimony, and report whether the plaintiff is seised in fee of the tract of land the subject-matter of the proposed sale, and can convey a good title therefor in fee simple; that he also report what are the incumbrances upon the said land, if any there be,

and how and in what manner they can be removed. He shall also inquire and report how much of the personalty in said plantation now remains, and the value of such as may have been used, destroyed, or lost, with leave to report any special matter.