**J. J. RAY, Appellant,**

v.

**Vida S. WOOSTER, and Vida S. Wooster, Executrix of the Estate of A. M. Wooster, Deceased, Respondents.**

No. 43778.

Supreme Court of Missouri.

Division No. 2.

Sept. 13, 1954.

746

Derwood E. Williams, Troy, Jean Voelkerding, Dutzow, Alvin H. Juergensmeyer, Warrenton, for appellant.

Ralph C. Lashly, Richard M. Stout, Francis R. Stout, St. Louis, for respondents.

ANDERSON, Special Judge.

This suit was brought by J. J. Ray, as plaintiff, against A. M. Wooster and Vida S. Wooster, husband and wife, as defendants, for specific performance of a contract alleged to have been entered into on April 17, 1951, whereby defendants agreed to sell and plaintiff agreed to buy certain real estate consisting of a farm containing 359 acres, more or less, located in Lincoln County and known as "Oak Hill Farm", together with the cattle and certain farm implements on said farm. The trial court found the issues in favor of defendants, and entered its decree denying the relief prayed. Thereafter, defendant A. M. Wooster died, and Vida S. Wooster, executrix of his estate, was made a party defendant. From the judgment, plaintiff has appealed.

The case was tried upon an amended petition and answer thereto. Said petition, in substance, alleged that on April 17, 1951, an agreement was entered into between the parties for the sale of the property in question. The consideration for said sale was alleged to be the sum of $33,600. It was further averred that at said time plaintiff gave to defendants a check for $5,000 as earnest money, to be applied on the purchase price upon consummation of the contract, and that at said time a receipt for same was signed and delivered by defendants to plaintiff, which receipt was as follows:

"April 17, 1951.
"Received of J. J. Ray the sum of $5000 in the form of a check as part payment on my farm known as Oak Hill Farm, including land, buildings, cattle and implements acreage 359 more or less the amount $33,600.00.
"Balance $28,600 payable on delivery title clear of any incumbrances.
"The term all cattle as of this date.
"The sum of $10.00 to be paid to B. F. Simpson for each calf on hand.
"A. M. Wooster
"Mrs. Vida S. Wooster."

It was then alleged that plaintiff was at all times ready, able and willing to fulfill the terms of said agreement but that defendants had refused to convey said property to him.

It was further alleged that since entering into said agreement defendants had wrongfully disposed of a number of the calves agreed to be sold to plaintiff under said contract, making it impossible for defendants to specifically perform the contract in full with respect to the personal property, and that by reason thereof plaintiff was entitled to recover the sum of $10,500, the value of the calves sold, and have specific performance with respect to the remainder of said personal property.

The prayer of the petition was for specific performance with respect to said real estate, and said personal property then in possession of defendants, and for the sum of $10,500—the value of the personal property wrongfully sold by defendants. There was also a prayer for general relief.

By their answer, defendants denied the allegations of plaintiff's petition which averred the making of the contract. It was then alleged that the receipt pleaded by plaintiff in his said petition was not sufficient to satisfy the requirements of the

statute of frauds. Sections 432.010 and 432.020 RSMo 1949, V.A.M.S.

It was further alleged that defendant A. M. Wooster's health was such as to render him unable at times to comprehend and understand ordinary matters of business, which fact was well known to plaintiff; that on April 17, 1951, said defendant was not mentally capable of transacting business; that plaintiff was at said time requested to leave defendants' premises, for the reason that defendant A. M. Wooster was unable to discuss the matter of the sale of said premises, but that plaintiff refused to leave and continued for four hours to urge defendants to sign said receipt; that plaintiff knew or should have known that defendant A. M. Wooster was senile and not capable physically or mentally of resistance to plaintiff's pressure; and that plaintiff "fraudulently coerced and intimidated and used undue influence in attempting to secure defendants' signatures to said memorandum receipt."

The trial court, in a memorandum filed in said cause, held that the description of the premises in the receipt signed by the defendants was insufficient to satisfy the requirements of the statute of frauds Section 432.010 RSMo 1949, V.A.M.S., and for that reason the contract was unenforceable. The validity of that ruling is the first point for our consideration.

The record shows that the farm in question consisted of 359 acres and was located about seven miles west of the town of Foley in Lincoln County, Missouri. It was the only farm owned by defendants. There was testimony from which it could be found that the farm was well known in the community as the "Oak Hill Farm".

Mr. Robert Lester, a farmer living in the vicinity of defendants' farm, testified that he knew the Oak Hill Farm; that it was located about one mile from his place; that it was owned by Mr. Wooster, and was fenced and well marked. He further testified:

"Q. You can go out and point it out and be within the bounds of it? A. Yes.

"* * * * * *

"Q. Do they have a truck out there? A. They did have a small truck.

"Q. Did they have anything painted on it? A. It had 'Oak Hill Farm' on it.

"* * * * * *

"Q. And is that farm generally known by everybody out there in the neighborhood as the Oak Hill Farm? A. Yes."

Herbert Davis, a farmer who lived near Briscoe, Missouri, testified:

"Q. Do you know a farm by the name of Oak Hill Farm near Lincoln County? A. Yes.

"Q. Who owns that farm? A. Mr. A. M. Wooster.

"Q. Where is that farm located? A. Oh, it is somewhere near Snow Hill, back from Winfield."

Sam Shields, a farmer living a mile and one-half south of Brussles, Missouri, testified:

"Q. Do you know the Oak Hill Farm? A. Yes.

"Q. Do you know who owns that? A. Mr. Wooster, I suppose. * *

"Q. Are the boundaries of it well marked—are they fenced, and those things? A. Very well, I judge.

"Q. About like the average farm? A. Yes."

Ernest Shields, a farmer living about a mile and a half southeast of Snow Hill, testified:

"Q. Do you know the Oak Hill Farm? A. Yes, sir.

"Q. Who owns that, Mr. Shields? A. Mr. Wooster * * * When I was a younger man I hunted it over— I mean I hunted over nearly every foot of it, rabbit hunting and bird hunting.

"Q. You know the boundaries of it? A. Pretty well.

"Q. And it is fenced and marked off—the Oak Hill Farm is? A. Yes. He had to have it fenced to keep the stock in.

"Q. You could go out and point out to anyone and show them the boundary lines of the Oak Hill Farm? A. Pretty well, * * *."

A. M. Magruder, a farmer 87 years old living seven miles west of Foley, testified that he knew the Oak Hill Farm. He testified:

"Q. How far is that from your place? A. Well, around the road it is a mile and a half; right straight through it is about three-quarters of a mile.

"Q. How long have you known that place? A. All my life.

"Q. Who now owns that place? A. Mr. Wooster.

"* * * * * *

"Q. Could you point this farm out, the Oak Hill Farm—could you point out the boundaries to it—it is fenced isn't it? A. Yes, but not on the north line. There is a fence on the north side of the place, but it don't go near down to the line * * *.

"Q. Do you know approximately how many acres are in it? A. I have heard here today that there are 359.

"Q. Would that be approximately correct, according to your understanding? A. Yes."

Edward Cannon, a real estate dealer, testified that the farm in question was commonly called the Oak Hill Farm. Mrs. Wooster testified that the farm was known as the Oak Hill Farm, and was the only farm that she and Mr. Wooster owned. Several letters written by defendant A. M. Wooster were introduced in evidence. Each was on stationery which had printed thereon as a part of the letterhead the words, "Oak Hill Farm, R.F.D. Foley, Mo., Lincoln County."

Plaintiff was engaged in farming and cattle raising on a farm near Elsberry, Missouri. In October, 1950, he purchased thirteen head of cattle from Mr. Wooster. At the time of this purchase the certificates of registration for the cattle were not delivered to him. Thereafter, on several occasions, plaintiff requested Mr. Wooster to send him said certificates, but to no avail. Finally, on April 17, 1951, plaintiff, in a further effort to secure the certificates, made an appointment to meet Mr. Wooster at the latter's home in St. Louis. The appointment was made for 1:30 p. m., and plaintiff arrived at the apartment where defendants lived shortly after 1:00 o'clock. He was accompanied by Mr. William H. Schoene who had agreed to assist plaintiff in securing the registration papers from Mr. Wooster. For the first twenty minutes the parties discussed the matter at hand, that is, the registration of plaintiff's cattle. Thereafter, something was said about defendants' farm being for sale. Plaintiff's testimony with reference to the negotiations is as follows:

"I asked Mr. Wooster if he would sell the farm and he said he would but that the cattle would have to go with the farm. * * * He told me that the price was $35,000, and then we discussed the matter of carrying paper back on it. He said it would have to be cash, and I thought about the proposition a little while and finally countered with an offer of $32,500, and at that time Mr. Wooster left the room, * * * and presently he came back and agreed to the sale of the farm, but told me that I would have to take his farm, his tractor, and his tractor equipment, and I asked him—

"Mr. Juergensmeyer: Q. That $32,-500 covered the farm and the cattle? A. The farm and the cattle, yes, sir; and then I asked him what he wanted for his tractor equipment and he said his dealer had offered him $950 for it, and I asked him if that price was sat-

isfactory, and he said 'yes' and I told him I would take it. Then he had a team of horses, wagon and harness, and he told me it would be necessary for me to take the team, wagon and harness, and the price of that was $150, and he told me * * * that he had an agreement with Mr. B. F. Simpson, his farm manager, whereby he received $10.00 cash at market time and I would have to assume this $10.00, and after some consideration I accepted the proposition and tendered my check in the amount of $5,000 as earnest money * * *."

The check referred to was made payable to A. M. Wooster and was drawn on the Bank of Dutzow. In the lower left corner of the check was the notation: "Earnest money on purchase of farm, all live stock and machinery." The evidence shows that plaintiff at the time, and at all times since, had sufficient funds in his bank account to meet said check, and that plaintiff thereafter made arrangements with the Bank of Dutzow to pay the balance of the purchase price upon defendants' tender of a deed to the premises. Mr. Wooster accepted the check and, at the time, in his own handwriting drew up the receipt in question. Thereafter, he and Mrs. Wooster signed the receipt and delivered it to plaintiff. This is the receipt pleaded in the plaintiff's petition, which we have heretofore set out in this opinion. Mr. Wooster deposited the check in his account at the United Bank & Trust Company in St. Louis. The latter forwarded the check to the Bank of Dutzow through the Federal Reserve Bank in St. Louis. It was received by the Bank of Dutzow on April 20, but before it was charged to plaintiff's account in said bank Mr. Schenk, Assistant Vice-President of the United Bank & Trust Company, at Mr. Wooster's request, called the Bank of Dutzow on the telephone and requested the return of the check to the Federal Reserve Bank. This was done. Thereafter, the Federal Reserve Bank returned the check to the United Bank & Trust Company. The amount of the check was then charged back to Mr. Wooster's account and the check delivered to Mr. Wooster. Defendants tendered the check to plaintiff in their answer.

On defendants' farm at the time were forty black Angus cows, one Jersey cow, one black Angus bull, nineteen yearlings, and thirty-seven calves.

■ The law does not require that a contract for the sale of land shall in itself be wholly sufficient to identify the property. The writing is sufficient if it clearly reveals the intent of the parties with reference to the particular tract which is the subject matter of the sale and furnishes the means of its identification; or, as some cases hold, if it provides the "key" to the identification—the applicable principle being that that is certain which can be made certain. Anderson v. Hall, Mo.Sup., 188 S.W. 79; Shy v. Lewis, 321 Mo. 688, 12 S.W.2d 719; Fox v. Courtney, 111 Mo. 147, 20 S.W. 20; Smith v. Wilson, 160 Mo. 657, 61 S.W. 597; Black v. Crowther, 74 Mo.App. 480; Wilcox v. Sonka, 137 Mo.App. 54, 119 S.W. 445.

■ In Anderson v. Hall, Mo.Sup., 188 S.W. 79, 81, the court regarded the vital inquiry to be whether or not the writing contained a reference "to external standards in existence at the time and capable of being determined beyond dispute." The terms of the writing cannot be contracted or varied by parol evidence of those external standards, but such evidence is admissible to show what real estate the defendant had, and to apply the description to it. Danforth v. Chandler, 237 Mass. 518, 130 N.E. 105; Shy v. Lewis, 321 Mo. 688, 12 S.W.2d 719.

■ It is also the universal rule that the situation of the parties and the circumstances under which the writing was executed may be looked to when necessary to aid in arriving at the meaning of what they have written. White v. Breen, 106 Ala. 159, 19 So. 59, 32 L.R.A. 127; Oliver v. Hunting, 1890, 44 Ch.Div. 205. This is no more than a recognition or application of the rule which prevails generally concerning the construction of written instruments.

It is the respondents' contention, which the trial court sustained, that the description in the receipt in the case at bar is insufficient because it failed to specify the state or county in which the premises bargained for were located. We believe the trial court erred in upholding this contention. The better view appears to be that such omission is not fatal, under the statute, if the location in any manner otherwise appears from the writing, or, if the property can be identified with reasonable certainty with the aid of the data supplied by the instruments and a consideration of the attending circumstances.

In some cases a description has been held sufficient even though it omits all reference to the state or county, municipality, section, township, or range, where it appears that the vendor owned a piece of land, and one only, answering the specifications given; and especially is this true when the writing mentions ownership. Gendleman v. Mongillo, 96 Conn. 541, 114 A. 914; Foster v. Civale, 134 Conn. 469, 58 A.2d 520; Montgomery v. Graves, 301 Ky. 260, 191 S.W.2d 399; Gilbert v. Tremblay, 79 N.H. 431, 111 A. 314; Price v. McKay, 53 N.J. Eq. 588, 32 A. 130; Johnson v. Edmunds, 197 Misc. 959, 96 N.Y.S.2d 68; Sawert v. Lunt, 360 Pa. 521, 62 A.2d 34; Sholovitz v. Noorigian, 42 R.I. 282, 107 A. 94; Sorsby v. Thom, Tex.Civ.App., 122 S.W.2d 275; Kirshner v. Feigenbaum, 180 Tenn. 476, 176 S.W.2d 806.

A better case of compliance with the statute is made if, in addition to ownership, the writing contains a specification of the size of the premises. Thus, in Burns v. Witter, 56 Or. 368, 108 P. 129, 130, the writing designated the premises as "my farm containing 40 acres", but did not give the section, township, range, county or state. The court held the description sufficient under the statute, as against a demurrer, when the complaint alleged that the farm was owned by the defendant husband, and was the only piece of real estate that he or his wife or both of them owned, and that at all times mentioned in the complaint the defendants were in possession of the property. See Norton v. Smith, 179 N.C. 553,

103 S.E. 14; and Moore v. Exelby, 170 Ark. 908, 281 S.W. 671.

The designation of the land by ownership and popular name has been held in many cases to be sufficient. Michelson v. Sherman, 310 Mass. 774, 39 N.E.2d 633, 139 A.L.R. 960; Hollis v. Burgess, 37 Kan. 487, 15 P. 536; Jones v. Hickson, 204 Miss. 373, 37 So.2d 625; Raines v. Baird, 84 Miss. 807, 37 So. 458; Henry v. Black, 210 Pa. 245, 59 A. 1070; Davis v. Davis, 171 Ark. 168, 283 S.W. 360; Simmons v. Tobin, 89 Fla. 321, 104 So. 583; Hyden v. Perkins, 119 Ky. 188, 83 S.W. 128; Francis v. Barry, 69 Mich. 311, 37 N.W. 353; Simmons v. Spruill, 56 N.C. 9; Cherry v. Long, 61 N.C. 466; Thornburg v. Masten, 88 N.C. 293; Morrison v. Dailey, Tex.Sup., 6 S.W. 426; Posey v. Kimsey, 146 Ky. 205, 142 S.W. 703.

From the cases, it appears that mention of the state and county is essential to the validity of the writing only when necessary for the purposes of identification. Failure to make such mention will not invalidate the instrument under the statute of frauds where other adequate elements of identification exist by which the location of the property can be determined. If from the description given one may, with the aid of extrinsic proof not inconsistent with the writing, locate the property, the writing must be held to comply with the statute of frauds.

In the case at bar the writing contains several "keys" or means of identification which have been held sufficient in the foregoing cases. Also, ownership is mentioned —the receipt designating the property as "my farm". Such term embodies the assertion of ownership—a fact which may be verified by resorting to public records. Size is indicated as "acreage 359 more or less," and the popular name given as "Oak Hill Farm"

The proof offered, which in no way contradicts the writing, was that defendants owned a farm containing approximately 359 acres, located about seven miles from Foley in Lincoln County, which was the

only farm they owned, and that said farm was generally known as "Oak Hill Farm".

It was also shown through their manager, B. F. Simpson, that defendants were in possession of this farm. One of the stipulations in the receipt was that: "The sum of $10.00 to be paid to B. F. Simpson for each calf on hand." The proof was that defendants had an agreement with Mr. Simpson whereby he was to receive $10 at market time for each calf sold off defendants' farm in Lincoln County.

Upon consideration of the foregoing facts and circumstances, we are of the opinion that the receipt in question clearly reveals the intent of the parties to contract with reference to the farm in Lincoln County.

■ When a seller of land owns only one estate which answers the description given in a memorandum, it must be taken to be the estate to which the memorandum refers. Michelson v. Sherman, 310 Mass. 774, 39 N.E.2d 633, 139 A.L.R. 960. Such being the case, parol evidence can be resorted to in applying the description, that is, to identify and locate the land intended by the parties as the subject matter of the sale.

But respondents contend that the contract is too indefinite and uncertain to authorize a court of equity to decree specific performance for the reason that there is no date specified for closing the deal or for delivery of possession. There is no merit to this contention.

■■ Where time of performance is not made the essence of the contract an ambiguity in that respect will not defeat specific performance. In such cases, it is implied that performance may be required within a reasonable time. Cay v. Ferrell, 239 Ala. 297, 195 So. 224; Martin v. La Boon, 116 S.C. 97, 107 S.E. 320; Wilkins v. Somerville, 80 Vt. 48, 66 A. 893, 11 L.R.A.,N.S., 1183; Pegg v. Olson, 31 Wyo. 96, 223 P. 223; Ullsperger v. Meyer, 217 Ill. 262, 75 N.E. 482, 2 L.R.A.,N.S., 221; Bartz v. Paff, 95 Wis. 95, 69 N.W. 297, 37 L.R.A. 848;

N. E. D. Holding Co. v. McKinley, 246 N. Y. 40, 157 N.E. 923.

■ It is further urged by respondents that the contract is incomplete because it did not specify whether conveyance of the land was to be by warranty deed or merely by a quitclaim deed. In order to authorize specific performance in such cases it is not necessary that the contract specify the character of the deed to be executed, since it may be implied that a conveyance of the fee by deed with general warranty is intended. Skinner v. Stone, 144 Ark. 353, 222 S.W. 360, 11 A.L.R. 808.

Respondents also contend that the contract was incomplete because the parties failed to contract with reference to (1) whether an abstract of title was to be furnished, and who should pay for same; (2) the length of time to be allowed the buyer to examine said abstract; (3) who should bear the expense of perfecting the title should same be found defective; (4) adjustments with reference to taxes and insurance, and the dates thereof; (5) under what conditions would defendants be entitled to forfeiture of the earnest money; (6) the manner of transferring the personal property; (7) transfer of the registration of the cows in question on the books of the Aberdeen Angus Breeders' Association, and the registration of the calves in said Association; and (8) who should assume the risk of loss of cattle that might die pending the closing of the deal, and the value to be attributed to the animals so dying.

■ The universal rule is that a contract to be specifically enforceable must be complete in its essential and material terms, and capable of being enforced without adding to its terms. A corollary to this rule is that where the contract does contain the essential elements it is not incomplete or indefinite because it fails to express in terms some matters concerning the performance of the contract which are usually found in such instruments and calculated to facilitate the attainment of its object, or does not include other non-essential provisions which

might properly have been incorporated in the agreement. Such matters may be left open for future specification without destruction of the contract or depriving a party remedy for its enforcement. 81 C.J. S., Specific Performance, § 35, p. 496; Milner Hotels, Inc. v. Ehrman, 307 Mich. 347, 11 N.W.2d 914.

■ The essential terms of a contract of the character sought to be enforced in this action are: (1) the parties; (2) the subject matter; (3) the promises upon both sides; (4) the price; and (5) the consideration. Pomeroy's Specific Performance of Contracts, (3rd Ed.) sec. 87, page 211; Ogooshevitz v. Arnold, 197 Mich. 203, 163 N.W. 946, 165 N.W. 633. All five of said elements were present in the contract in the case at bar; and while it is true that the parties failed to agree as to the several matters hereinbefore mentioned as relied on by respondents, such failure does not preclude a court of equity in granting the relief of specific performance. The parties themselves should be permitted to determine the terms of the contract, and the court should enforce the agreement if it contains the essential elements hereinbefore mentioned. The fact that the parties did not go further and contract with reference to every possible contingency which might arise with respect to the transaction did not render the contract incomplete.

It is also urged that the contract was rendered incomplete by failure of the parties to specify as to who should pay the tenant for his interest in the crops, and who should pay the $10 to B. F. Simpson for each calf on hand. It does not appear that there was a tenant on the farm in question, or that anyone had an interest in the crops except the Woosters. On the contrary, it would appear that respondents were at the time operating the farm through their manager, B. F. Simpson. As to the $10 payable to B. F. Simpson, the only reasonable inference to be drawn is that said sum was by the terms of the memorandum to be paid by the buyer as a part of the consideration for the property bought.

■ It is next urged that since plaintiff did not sign the memorandum the contract could not be enforced against him, hence there was lacking a mutuality of remedy. There is no merit to this contention.

The filing of a suit on a contract by the party not signing against the other party who did sign supplies the requirement of mutuality of remedy. Kludt v. Connett, 350 Mo. 793, 168 S.W.2d 1068, 145 A.L.R. 1014. See 49 Am.Jur. "Statute of Frauds", sec. 387, page 689; 49 Am.Jur. "Specific Performance", sec. 37, page 51; and Ullsperger v. Meyer, 217 Ill. 262, 75 N.E. 482, 2 L.R.A.,N.S., 221.

■ Respondents urge that relief by way of specific performance should be denied for the reason that there was no meeting of the minds as to the subject matter of the sale. In support of this contention it is pointed out that the receipt executed by Mr. Wooster purports to sell "cattle and implements", while the check given for part payment recites "all live stock and machinery", thus indicating that plaintiff intended to buy the hogs located on the farm and a Jersey cow and calf which Wooster did not intend to sell.

From the uncontradicted testimony of plaintiff it is clear that the hogs were not included in the sale, and that at the time the contract was negotiated Wooster stated he would give plaintiff "first chance" on the hogs if he was interested in them. It is also clear from the evidence that the parties intended that the receipt in question should be the sole written memorial of their agreement. Prior to executing the receipt plaintiff told Wooster that he did not feel capable of drawing up the contract, but that he probably could secure a printed form at some stationery store in the vicinity. Plaintiff then left the meeting and was gone for perhaps a half hour. He did secure some printed forms, but in his testimony stated that they were "very complicated". Plaintiff testified he told Wooster that "it would be agreeable to me if he would give me a receipt in his own handwriting, signed by both him and Mrs. Woo-

ster, and that is what he did." The receipt was then delivered to and accepted by plaintiff. From this evidence, it is clear that the parties intended that all of the constituent terms of the contract were to be included in the receipt, and that it alone should be the evidence of their agreement. There is, therefore, no basis in the evidence to support respondents' contention.

It is next urged that specific performance will not be granted when part of the personal property is sold and the contract price is for one lump sum. In the case at bar it appears from the record that Mr. Wooster sold part of the cattle after the agreement of sale was entered into.

The general rule is that when the vendor has partly disabled himself from carrying out the contract the vendee may have the contract specifically performed to the extent of the vendor's ability to comply, by requiring him to convey what he has, and at the same time have a just abatement of the purchase price for the deficiency to compensate him for the vendor's failure to perform the contract in full. The fact that the contract price is for one lump sum should not defeat the action. In such a case, the amount to be deducted from the purchase price should be the value of the property sold. Dixon v. Anderson, 4 Cir., 252 F. 694; Welts v. Paddock, 139 Wash. 668, 247 P. 953; Foster v. Klinger, 92 Ind. App. 700, 175 N.E. 136; Silvert v. Carlson, 24 Man. 790; Brown v. Smith, C.C., 109 F. 26.

It is objected that the action will not lie for the reason that B. F. Simpson was not joined as a party defendant.

The evidence shows that B. F. Simpson was employed as defendants' farm manager and, as a part of his compensation, was to receive $10 for each calf sold. In the contract of sale plaintiff agreed to assume payment of this amount. Simpson was not a party to the contract of sale.

In an action on a contract by one of the parties thereto, the only parties defendant who may be necessary are the other parties to the contract sued on, and those who have an interest in the dispute which will be affected by the action. 67 C.J.S., Parties, § 46, p. 969. Since Simpson was not a party to the contract, and since his rights will not be adversely affected by the action, he was not a necessary party. Furthermore, the objection comes too late, for the reason that it was not raised by any pleading in the case. Anderson v. Hall, Mo.Sup., 188 S.W. 79.

Respondents further contend that there should be no decree of specific performance in this case because the contract was procured through fraud and duress. In support of this defense considerable evidence was introduced at the trial in an attempt to show that Mr. Wooster was mentally confused at or about the time the contract was entered into, and that plaintiff took advantage of this condition to drive a hard and unconscionable bargain.

According to the testimony of Dr. D. R. Parman, Mr. Wooster at the time was suffering from high blood pressure and hardening of the arteries. He also stated that he thought Mr. Wooster had arteriosclerosis of the brain "because his memory was not good and he gets confused. He doesn't remember what he does or says." He further testified that he thought the condition was of recent origin and that it had arisen "since sometime in 1951." He stated that:

"in March 1951, he was very much disturbed mentally—didn't know what was going on * * * he was in bed at home. * * * I insisted he stay in bed. I think he called me the first day he was in bed. * * *

"Q. Did he talk rationally to you? A. Well, in some instances, but he was confused about what was happening to him. He didn't know what had gone wrong. * * * I probably gave him some sedatives—phenobarbital. That sometimes quiets your nerves and brings the blood pressure down a little. * * *

"Q. Now, on what other occasion did you notice mental confusion, doc-

tor? A. Oh, I don't know; two or three different times * * * he would come to my office and tell me a long story about something and the next time he came he would tell it differently.

"Q. What kind of stories did he tell you? A. Oh, about how he felt or something like that * * *

"Q. But they did indicate to you mental confusion? A. Yes.

"Q. Would you say that that was a natural consequence of this affliction of hardening of the arteries * * * of his condition? A. I think so."

The witness further testified that he had seen Mr. Wooster a few times since 1951 and that sometimes he was better and other times was "not quite so well".

Lorene Parker, who was Mr. Wooster's secretary, testified that frequently Mr. Wooster would have spells of terrific pains in his stomach and head, after which his mind was "befuzzled". She stated that he had one of these spells at his office on April 17, 1951, just before he left for his home to meet plaintiff and Mr. Schoene. She stated that Mr. Wooster's mental condition "was fine until he got one of those spells."

Mrs. Wooster testified that she was home when Mr. Ray and Mr. Schoene called at the apartment on April 17th, the day the contract was executed. She stated that she visited with them for about fifteen minutes and then went into her bedroom. She stated that when Mr. Ray began talking about the farm Mr. Wooster said he had better call Mr. Cannon, his real estate agent, because the farm was listed with Mr. Cannon; that Mr. Ray replied, "No, don't call him, we don't want him in on this"; that Mr. Wooster then said, "It is listed with him. I want him to be paid for the time he spent showing the farm." She further testified that Mr. Ray and Mr. Schoene arrived at the apartment about 1:30 p. m. and left around 5:30 or 6:00 p. m. She stated that she signed the con-

tract because Mr. Wooster called her in to do so. The witness further testified:

"Q. Mrs. Wooster, on April 17, 1951, was Mr. Wooster under the care of a physician? A. I didn't say that he was mentally incapable on that occasion * * * I said he was sick. * * * He was and had been under the care of a physician. * * * I will say this, he had caught cold and his stomach tortures him most of the time. He has stomach trouble. * * * Well, he had it in his shoulder and he went to an osteopath in the Chemical Building to get a treatment to try to get rid of the pain in the shoulder and that is what he felt that day.

"* * * * * *

"Q. Did you hear Mr. Wooster at any time ask these gentlemen to come back later? A. Yes, I did. That was when they first began to talk about the farm and Mr. Wooster said, 'I am feeling sort of bad today.' He said, 'Could you come back tomorrow or the latter part of the week?' and Mr. Ray said, 'No, I can't make it. I can't come later.' * * * I heard Mr. Wooster say that twice. I wouldn't say when the other time was. * * * He didn't tell him to get out. He just said, 'could you come back tomorrow or the latter part of the week?' He said, 'I am not feeling quite up to par today,' or something like that.

"* * * * * *

"Q. Did Mr. Wooster come out to see you when you were sitting in this other room during the afternoon? A. Yes, he came back once or twice. Once he came back and took an aspirin tablet for his stomach. * * *

"Q. Did he complain to you about any physical disability he was having that afternoon? A. Yes. * * *

"* * * * * *

"Q. How did Mr. Wooster appear to you on the day of April 17, 1951? * * * A. He acted like he was very

uncomfortable. He was flushed in his face because he had a fever with his cold and a stiff shoulder and he had rushed out there to be there to meet Mr. Ray. * * *"

At the time the contract was entered into, and for many years previous, Mr. Wooster had been actively engaged in business as a manufacturer's agent. There was testimony introduced by plaintiff which tended to show that Mr. Wooster was normal mentally and fully capable of understanding the ordinary affairs of business at the time in question. From the testimony of plaintiff and Mr. Schoene it would appear that Mr. Wooster was mentally competent at all times while negotiating for the sale of the property, and that no fraud, misrepresentation or duress was at any time practiced upon him. It would serve no useful purpose to unduly lengthen this opinion by reviewing in detail all the plaintiff's evidence on this issue. Suffice it to say that, after carefully and fully considering all the evidence, we are convinced there is no merit to the respondents' contention on this issue.

We are also of the opinion that the contract was not unconscionable or a "hard bargain". At the time in question, Mr. Wooster had the farm listed for sale with Mr. Cannon, a real estate agent, at $20,000. Mr. Cannon, though not shown to have the qualifications of an expert on the value of cattle, testified that as of May 1, 1951, he estimated the value of the cattle at $20,000. Mr. Herbert Davis, a farmer and a witness for the plaintiff, testified that in his opinion the cattle were worth $12,000.

After Mr. Wooster had repudiated the sale to plaintiff, Wooster notified Mr. James M. Crawford, who had previously been negotiating for the purchase of the farm, that the farm was again on the market. Crawford told Mr. Wooster that he was still interested. Mr. Crawford testified as follows:

"Q. What did he price the farm to you at? A. Thirty-eight to thirty-nine thousand; he thought it might be two thousand more or maybe a little less."

Mr. Crawford further testified that the figure mentioned included the hogs and corn, in addition to the cattle and machinery.

It is clear from the evidence adduced that there was no such inadequacy of consideration shown as to justify denial to plaintiff of the relief sought. See Pomeroy's Specific Performance of Contracts (3rd Ed.), sec. 193, page 496.

Plaintiff is entitled to a decree requiring the defendants to convey to him by good and sufficient warranty deed the premises covered by the contract described in plaintiff's petition; and, further, to deliver to him all the personal property covered by the contract in question and not disposed of by defendants, upon tender into court by plaintiff of the purchase price less an abatement thereof in an amount equal to the value of the personal property heretofore sold—said amount of the abatement to be determined by the court upon a hearing. Since the rights and liabilities of the parties are to be determined from the contract, the value of the property sold should be determined as of the date of the contract.

The judgment is reversed, and the cause is remanded for further proceedings in conformity with the views herein expressed.

BROADDUS, Special Judge, and LEEDY, Acting P. J., concur.