**MIDLAND REALTY COMPANY, Appellant,**

**v.**

**Thomas MANZELLA, Respondent.**

**No. 22661.**

Kansas City Court of Appeals.

Missouri.

Dec. 2, 1957.

William H. Woodson, Chapman & Chapman, Donaldson Chapman, Chillicothe, Spencer, Fane, Britt & Browne, Kansas City, for appellant.

J. K. Owens, Kansas City, for respondent.

HUNTER, Judge.

This is an appeal from a judgment of the Circuit Court of Jackson County for defendant in an unlawful detainer action brought by Midland Realty Company, plaintiff-appellant, against Thomas Manzella, defendant-respondent, for detention damages and possession of certain premises known as 315 and 317 East Tenth Street, Kansas City, Missouri, wherein were located the Jungle Club, a restaurant, and a parking lot.

Midland Realty Company, referred to herein as Midland, is a family owned corporation, and for over twenty years Mervin Cies, has been its president and director, his wife and brother-in-law being the other two shareholders. For a number of years prior to January 31, 1956, this corporation had leased the premises to Thomas Manzella by various written leases.

In August, 1941, Midland by written agreement employed M. W. Major, referred

to herein as Major, a Kansas City realtor of many years' experience, to collect the rents and to inspect and report repairs and replacements needed on certain of its properties including the leased premises involved herein. This agreement provided in part " * * * It is understood and agreed that (Major) shall have no authority or right to lease any of said property but shall forward all applications therefor to First Party" (Midland).

As of January, 1951, Midland and Manzella entered into a five year written lease of the premises. This lease is in evidence. It was prepared by Major in duplicate and delivered to Manzella for his signature. After being signed by Manzella in duplicate both copies were forwarded to Cies who signed them as president of plaintiff company. Thereafter, one signed copy was returned to Manzella. This lease contained many of the usual terms of a business lease, and provided for a total rental of $42,000 payable at the rate of $700 per month at the office of M. W. Major, Inc. By its terms, it commenced February 1, 1951, and expired January 31, 1956. It also provided that: "Lessee has the privilege of subleasing any of the leased premises, providing the prospective sublessee is acceptable to Lessor" and that; this lease, "may not be assigned or transferred to others without the written consent of the Lessor."

As the termination date of this five year lease approached, Major, Manzella, and Midland, through its president Cies, exchanged correspondence and a so-called renewal lease, which respondent claims considered together, form a valid and binding lease that meets all the requirements ol the applicable Statute of Frauds. Section 432.-050 RSMo 1949, V.A.M.S. Appellant claims this correspondence and document did not result in a valid lease. Thus, we proceed to set out and examine the correspondence and "renewal lease" in some detail.

Under date of September 13, 1955, Major wrote Cies, who resided in Chillicothe, Missouri:

"Enclosed is the credit report, as requested, on Thomas Manzella.

"We have done nothing further concerning the lease, as Mr. Manzella has either been out of the City, or unable to be reached since talking with him last week."

On October 11, 1955, Cies wrote Major:

"In reply to your letter of October 4, regarding the signing of the lease for five years with Manzella, wish to advise that it will be satisfactory to renew it for the five year period at $1,000 per month.

"I am not extremely particular about the lease as it appears we are the only ones obligated. His net worth is very small, but not much smaller than I had expected, but if he is willing to sign it, we will accept it."

On October 13, 1955, Major wrote Manzella:

"Your new lease is in our office, ready for your signature.

"I would like to know why the bill to the Fox Construction Company for the work on the Oak Street entrance to the parking station has not been paid. The Fox Construction Company talked with us today and advised us that they have not received payment from you. Since we instructed the Fox Company to widen the entrance to the parking station upon the authority of Mr. Rich, and with the distinct understanding that this job was to be paid for by the parties interested in your lease, we nevertheless feel embarrassed that this bill has not been paid.

"Will appreciate your advice on this matter by return mail."

On November 5, 1955, Cies wrote Major:

"This is to advise you that if Mr. Manzella wants the property that he has under lease, it will be necessary for me to have a letter to this effect

by the 21st of this month, otherwise I am going ahead with the other people that want the lease. It would be much better for me anyway.

"Also, I would like for you to inform Mr. Manzella that we cannot accept the lease until he has paid the H. H. Fox Construction Company bill for their part of the widening to the approach. Also, that the offer for a five year lease at $1,000 per month will not be good unless it is signed as I have specified above."

On November 7, 1955, Major wrote Manzella:

"We have received a letter, today, from Mr. Cies stating that unless you will complete the lease transaction concerning your Jungle Club property by the 21st of this month, he intends to go ahead and let the other parties have the lease. Mr. Cies also instructs us not to go ahead with this lease until the H. H. Fox Construction Company has been paid for the parking station driveway work.

"If you will recall we wrote you on October 13th advising you that the new lease was in our office ready for your signature, and since then we met Mr. Rich on the street and he said you would be in to sign the lease within the next few days."

Major, who at the time of the trial was no longer an employee of Midland, testified that Manzella came to his office on Friday, November 18, 1955, and looked over the "new lease" (which is in evidence) he had previously prepared, but did not sign it on that date. Instead, Manzella requested him to come to his office at the American Cab Company the following Monday, November 21, 1955, about it. However, he (Major) could not go to Manzella's office on Monday but went there on Tuesday, November 22, 1955. At that time Manzella signed two copies of the "new lease", kept one, and handed the other to Major. Later Major destroyed this copy because "it

wasn't dated, it wasn't proper." Cies testified he never saw the destroyed copy, nor any copy until he saw Manzella's at the trial.

Manzella testified that he signed three copies of the "new lease" and handed two of them to Major in Major's office on November 18, 1955. Manzella's son testified that he was present when his father was in Major's office on November 18, 1955. He was asked:

"Q. At the time you saw that in his office, at the time you saw that exhibit in Mr. Major's office on the day of November 18, 1955, I will ask you whether or not that was signed or not signed? A. My father's signature was on there just like it is now.

"Q. Did you see your father come out of the private office of Mr. Major? A. I did.

"Q. Did he have one lease or two leases or three leases in his hand? A. I couldn't answer that, I know he had one or more, I don't know whether he had two, three or four, I know he had one.

"Q. Was it signed? A. Yes, he showed me the signature, we looked at it together."

Mr. Rich, who was the active operator of the Jungle Club, testified that he arrived at Major's office on November 18, 1955, as Manzella and his son were leaving; that Major was present also, and that he, Rich, saw the signed "new lease" in Manzella's hand.

Manzella expected Cies to return a signed copy of the lease. Instead, by letter of December 17, 1955, Midland notified Manzella that his lease would expire on January 31, 1956, and that appellant wanted possession of the premises on February 1, 1956. On failure to obtain possession it instituted this unlawful detainer proceeding. Upon these facts the circuit court entered its judgment for defendant.

**330**

It is our duty to review this non-jury case upon both the law and the evidence as in suits of an equitable nature. We must make our own independent findings of the facts and reach our own conclusions as to where the weight of the evidence lies. In so doing, we give due regard to the opportunity of the trial judge to judge the credibility of the witnesses. The judgment may not be set aside unless clearly erroneous. Section 510.310 RSMo 1949, V.A.M.S.; Faire v. Burke, 363 Mo. 562, 252 S.W.2d 289; Minor v. Lillard, Mo.Sup., 289 S.W.2d 1.

Appellant's primary contention is that the evidence discloses a complete failure to comply with the requirements set out in the Statute of Frauds, Section 432.050 RSMo 1949, V.A.M.S., namely, that: "All leases, estates, interests of freehold or term of years, or any uncertain interest of, in, to or out of any messuages, lands, tenements or hereditaments, made or created by livery and seisin only, or by parol, and not put in writing and signed by the parties so making or creating the same, or their agents lawfully authorized by writing, shall have the force and effect of leases or estates at will only * * *."

Respondent contends that the letters written to the agent of appellant (Major), and the letters written by the agent of appellant to respondent-Manzella, together with the lease delivered to Manzella by this agent, and signed by Manzella only, (1) as a related unit compose the contract or lease, and (2) satisfy the signature and other requirements of Section 432.050.

Respondent cites and relies upon numerous cases involving the interpretation of a neighboring section of the statutes, Section 432.010, which is also one of the so-called statute of frauds' sections and likewise part of the chapter titled, "Contracts Required To Be In Writing."

It is well established that under Section 432.010 the "lease" for a longer time than one year, mentioned therein, may consist of a number of writing sufficiently connected so as to warrant their being read together, and which, when so read, satisfy all the requirements of the statute as to contents and signature. Neither it nor the memorandum thereof need be contained in a single document. Polk v. Mitchell, 225 Mo.App. 145, 15 S.W.2d 961; Byers v. Zuspan, 241 Mo.App. 1103, 264 S.W.2d 944; Wheeler v. Blanton, Mo.App., 253 S.W.2d 497; 37 C.J.S. Frauds, Statute of § 177, pp. 656–659. Further, the elements missing or rendered uncertain in one writing may be supplied or rendered certain by another, and their sufficiency will depend upon whether, taken together, they meet the statutory requirements as to context and signature. Wheeler v. Blanton, supra; Byers v. Zuspan, supra; 85 A.L.R. 1184. As to the elements necessary to be present in order that the statute be satisfied, the following are required: (1) the parties; (2) the subject matter; (3) the promises upon both sides; (4) the price; and (5) the consideration. Ray v. Wooster, Mo.Sup., 270 S.W.2d 743; cf. Kelly v. Thuey, 143 Mo. 422, 45 S.W. 300; Byers v. Zuspan, supra. Differently stated, the writings must state the contract with reasonable certainty so that its essential terms can be ascertained from the writings without resort to parol evidence. Polk v. Mitchell, supra. As stated in the Polk case, 15 S.W.2d loc. cit. 963, " * * * it is a well-settled rule that when writings leading up to the execution of the lease show on their face that a present contract of renting was intended, the writings within themselves constitute a lease, especially where the tenant remains in possession under the writings. (Citations omitted.) No technical or formal language is necessary to create a written lease, and the same rules of construction are applicable as in other contracts." See also, Ray v. Wooster, supra. Under Section 432.010 only the signature of the party to be charged is required. Kludt v. Connett, 350 Mo. 793, 168 S.W.2d 1068, 145 A.L.R. 1014; Ray v. Wooster, supra; Annotation, 30 A.L.R.2d 972.

However, Section 432.050 requires all leases, etc., to be "in writing and signed by the parties so making or creating the same, or their agents lawfully authorized by writing". The obvious intent of the legislature in this enactment was to require both the lessor and the lessee, or their agents lawfully authorized by writing, to sign the lease. This is but the plain and rational meaning of the language used. Sinclair Refining Co. v. Wyatt, 347 Mo. 862, 149 S.W.2d 353; Blake v. Shower, Mo. App., 207 S.W.2d 775; Combs v. Midland Transfer Co., 58 Mo.App. 112. And it is in accordance with the primary rule of construction of statutes, which we recognize and follow; namely, to ascertain the lawmakers' intent, from the words used if possible, and to put upon the language of the legislature honestly and faithfully, its plain and rational meaning and to promote its object, and the manifest purpose of the statute, considered historically, is properly given consideration. Cummins v. Kansas City Public Service Co., 334 Mo. 672, 66 S.W.2d 920–925; Lawyers' Association of St. Louis v. City of St. Louis, Mo.App., 294 S.W.2d 676. The more difficult question is, may the lease mentioned in this section of the statute (432.050) consist of a number of writings sufficiently connected so as to warrant their being read together, as under Section 432.010, and may the required signatures of the lessor and lessee or their agents appear on separate writings? Stated somewhat differently, in enacting this section of the statutes, did the legislature contemplate by the use of the word "lease" only a single formal document upon which the signatures of both the lessor and lessee must appear?

Several cases aid in arriving at our answer. In the earliest of them, Welsh v. Ferd Heim Brewing Co., 47 Mo.App. 608, this court said: "It is first contended that the alleged lease is no lease, since it is not signed by the lessor. And so it is decided in Clemens v. Broomfield, 19 Mo. 118, as well as in many other cases in other jurisdictions, that it is requisite to the validity of a lease, where the letting is for a longer period than allowed by verbal contract, that it should be signed by the lessor. This being so, we will consider what is a sufficient signing within the spirit and meaning of the law. The object of the statute of frauds and perjuries was to prevent fraud and perjury by requiring that the lease should be put in writing and signed by the parties. This signing thus directed by the statute does not necessarily mean that the parties shall append their names to the end of the written instrument, but, rather, any certain, definite acknowledgment of the lease over the signature of the party, whether that be on the face or back of the lease, or even on a separate paper, as in a letter. Taylor's Land. & Ten., secs. 35, 36. In Whaley v. Hinchman, 22 Mo.App. 483, telegrams were held sufficient in a contract for the sale of real estate. In Hoover v. [Pacific] Oil Co., 41 Mo.App. 317, a contract evidenced by a letter from the lessee and indorsed 'accepted', and signed by the lessor, passed unquestioned. But in this case the lease is signed by each party alone signing the duplicate or copy kept by the other, and this we believe reasonably and substantially fulfills the object and aim of the statute." In Reid v. Gees, 277 Mo. 556, 210 S.W. 878, 880, the court held that the particular writing did not contain all of the necessary terms of a contract, especially that of mutuality of promises. With reference to the question of signature by the parties, the court reiterated the necessity under the statute of the signatures of both the lessor and the lessee but went on to say that if the lessor had signed one copy of the alleged lease and the lessee had signed another copy of it, "There might remain the question of mutuality of promises, but none as to the signature under the statute."

In Blake v. Shower, supra, the court reviewed the writings to ascertain whether or not as a related group they composed a lease within the meaning of Section 432.-050. In deciding that the related writings fell short of being a contract or lease the

court said: 207 S.W.2d loc. cit. 779, "If the contract or leasehold agreement had been actually concluded, it would not militate against plaintiffs' right to relief that the contract might have been made up of several different writings which, when connected and read together, showed all the terms of the agreement. Polk v. Mitchell, 223 Mo.App. 446, 15 S.W.2d 961."

■ To our minds these cases make it clear that, just as under Section 432.010 the lease may consist of a number of writings sufficiently connected so as to warrant their being read together, so also under Section 432.010 no formal lease consisting of a single document was intended, but rather the lease there mentioned may also consist of one or more writings sufficiently connected so as to warrant their being read together.

■ We also conclude that it is not necessary that the signatures of the lessor and lessee, or their duly authorized agents, both appear on the same writing or document. We are strengthened in our conclusion by other considerations. For example, the word "lease" in Section 432.050 is but one of a series of words denoting various interests in land, and as there used it appears to likewise refer to an interest in land, arising by contract, rather than to a single formal document. This interpretation is consistent, not only with the settled meaning of the same word as used in its neighboring Section 432.010, as we have discussed, but also is consistent with the requirements of Section 441.120 providing in essence that oral testimony is not permitted to show the renewal of a lease but same must "be established by contract in writing." A contract in writing could consist of a written offer to renew a specific written lease, the written offer being signed by lessor and the written acceptance of that offer being signed by lessee. Cf. Hathaway v. Nevitt, 358 Mo. 202, 213 S.W.2d 938.

Applying these principles to the instant case, we note that on October 11, 1955,

in a signed letter Cies advised Major that it was satisfactory with him (Cies) to *renew* Manzella's five year lease for a five year period at $1,000 per month. Further, that "if he (Manzella) is willing to sign it, we will accept it." Thus, Major wrote Manzella on October 13, 1955, that "your lease is in our office, ready for your signature." On November 5, 1955, again by signed letter Cies wrote Major that "if Manzella wants the property he has under lease, it will be necessary for me to have a letter to this effect by the 21st of this month, * * *. * * * Inform Mr. Manzella we cannot accept the lease until he has paid the H. H. Fox Construction Co. * * * Also, that the offer for a five year lease will not be good unless it is signed as I have specified above."

On November 7, 1955, Major wrote Manzella relating Cies' message that Manzella must complete the lease transaction by the 21st, and reminding him of the October 13, 1955, letter advising that the lease was in his office ready for Manzella's signature. Manzella went to Major's office. He signed the lease. There is a factual dispute as to whether this occurred on the 18th of November, or the 22nd of November, and whether two or three copies were signed, and whether only one or two copies after being signed by Manzella were left with Major.

■ As we view these written documents, which certainly are sufficiently related to warrant consideration together, in essence, they contain over Cies' signature his offer on behalf of appellant to renew the then outstanding five year written lease on the premises at the rate of $1,000 per month if (1) Manzella first paid the H. H. Fox Construction Company bill (which he did); (2) If Manzella signed the new lease (which he did); and if he so signed by November 21st (which is disputed). The trial court, having entered its general judgment for defendant, is deemed to have found all necessary issues in defendant's favor, and, assuming but not deciding that the signing of the new lease by Manzella

on or before November 21, is necessary to the judgment rendered, the presumption is the trial court found that issue for defendant. Section 510.310(2) RSMo 1949, V.A. M.S.; Abeles v. Wurdack, Mo.Sup., 285 S. W.2d 544. It is our duty, of course, to review all the testimony and evidence on the subject, and, to reach our own conclusions giving due deference to the trial court's findings when there is a conflict of testimony involving the credibility of witnesses. This we have done, and our conclusion is that the signing of the lease by Manzella occurred on November 18, 1955.

Thus, stripped to its pertinent fundamentals, Cies made a written offer to Manzella (through his agent, Major, authorized by writing to convey that offer to Manzella) to renew the presently outstanding written lease on the premises for five years, but at a new rental rate of $1,000 per month instead of the old monthly rate of $700. The acceptance called for by Cies was that Manzella sign the proffered written renewal lease, it being merely the old lease recopied and redated except for the new rental rate of $1,000. Manzella signed the proffered "renewal lease" and returned it to Major. We deem these writings, including the old lease, the letters, and the renewal lease signed by Manzella sufficient to constitute the written lease (contract of lease) contemplated by Section 432.050, and likewise sufficient to satisfy its requirement that such lease be in writing, and be "signed by the parties so making or creating the same, or their agents lawfully authorized by writing * * *." Certainly as to context, all of the necessary elements are set out in writing in the old lease together with Cies' written offer to renew it for five years for $1,000 a month, and are again set out in writing in the written renewal lease sent Manzella by Cies' agent and signed by Manzella. The required signature of lessor is contained in his written offer to renew the written lease, and in his agent Major's signed letter conveying this offer to Manzella as he (Major) was instructed and authorized to do in writing in Cies' letter to him of November 5, 1955, and impliedly was instructed to do in the signed letter of October 11, 1955. The required lessee's signature is contained on the renewal lease signed in accordance with the written renewal offer.

Also, as we view the evidence, these writings including the signed renewal lease show on their face that a present contract of renting (lease) was intended by the parties and they were not merely preliminaries to a possible future contract. This is so even though Manzella expected to eventually receive back a copy of the "renewal lease" signed by Cies on behalf of appellant.

Having determined that Manzella is entitled to possession of the premises under the five year renewal lease, other questions raised by respective counsel are no longer pertinent to the disposition of this case. Accordingly, the judgment of the trial court is in all respects, affirmed.

All concur.