**Jack C. HANES, et al., Plaintiffs,**

v.

**MID–AMERICA PETROLEUM, INC., Defendant.**

No. 83–0330–CV–W–1.

United States District Court, W.D. Missouri, W.D.

Dec. 22, 1983.

John B. Gage, II, Gage & Tucker, Kansas City, Mo., for plaintiffs.

Jerome W. Seigfreid, Seigfreid, Runge, Leonatti & Pohlmeyer, Mexico, Mo., for defendant.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, Senior District Judge.

### I.

This case pends on cross motions for summary judgment on the separated issue of defendant's liability under the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801, *et seq.*

On March 24, 1983, plaintiffs filed their complaint in this case along with an application for temporary restraining order and injunction. As is our usual procedure, we refused to grant an *ex parte* temporary restraining order, contacted counsel for both sides, and, after receiving an agreement that the status quo would be maintained, set the case for a conference. On March 29, 1983, after a conference with the parties, we entered an order in maintenance of the status quo and directed fur-

ther proceedings including an order "that the hearing on plaintiffs' motion for temporary restraining order and preliminary injunction and plaintiffs' prayer for permanent injunction be consolidated and conducted after the parties have completed all discovery on the issues involved in said requests for injunctive relief."

On August 19, 1983, the Court again met with the parties and it was agreed that the issue of liability under the provisions of the PMPA should be separated pursuant to Rule 42(b), Fed.R.Civ.P. Accordingly, a Rule 42(b) order was entered separating the issue of liability under the PMPA and setting that separated issue for trial. That order also provided that the parties prepare and file a stipulation of all undisputed facts and, if appropriate, to file cross motions for summary judgment on the issue of liability under the PMPA, so that, if possible, that issue could be determined without the necessity of an additional trial.

Both parties have filed a motion for summary judgment pursuant to the provisions of Rule 56, Fed.R.Civ.P., along with suggestions in support of their respective motions. The parties have also filed suggestions in opposition to the opposing party's motion. Plaintiff has filed a reply to defendant's suggestions in opposition. The record in this case includes certain depositions, affidavits and exhibits relied upon by the parties.

## II.

Subchapter I of the Petroleum Marketing Practices Act, titled "Franchise Protection," 15 U.S.C. §§ 2801–06, sets minimum federal standards for the termination or non-renewal of franchise relationships [1] for the sale of motor fuel. That Title was established to protect franchisees [2] from arbitrary or discriminatory termination or non-renewal of their franchises. S.Rep. No. 731, 95th Cong., 2d Sess. *reprinted in* 1978 U.S.Code Cong. & Adm.News 873, 874.

The Act is a complex piece of legislation which basically requires that, before a franchisor [3] may terminate a franchise or fail to renew a franchise relationship, the franchisor must (1) be able to point to a bona fide ground for termination as spelled out in the PMPA and (2) give adequate notice to the franchisee under the PMPA. 15 U.S.C. § 2802(b)(1).

The PMPA defines the term "franchise" as "any contract:" [4]

(iv) between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permit such use. 15 U.S.C. § 2801(1)(A) [5]

---

**1.** (2) The term "franchise relationship" means the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise. 15 U.S.C. § 2801(2)

**2.** (4) The term "franchisee" means a retailer or distributor (as the case may be) who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel. 15 U.S.C. § 2801(4)

**3.** (3) The term "franchisor" means a refiner or distributor (as the case may be) who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel. 15 U.S.C. § 2801(3)

**4.** (10) the term "contract" means any oral or written agreement. 15 U.S.C. § 2801(10).

**5.** Additionally, the PMPA provides that:
B. The term "franchise" includes—
(i) any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel, under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy.
(ii) any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed—
(I) under a trademark owned or controlled by a refiner; .... 15 U.S.C. § 2801(1)(B)

### III.

### A.

In their complaint, the plaintiffs allege that a franchise existed between plaintiffs and defendant under one of two alternative theories. In paragraph 1 of Count I, plaintiffs allege that "[o]n August 21, 1981, [defendant], by and through its employee, agent and Vice President, Pat Duff, entered into an oral agreement with plaintiff Jack C. Hanes under which defendant, a distributor of Shell Oil Company products, authorized and permitted plaintiffs to use, in connection with the sale of motor fuel, the Shell trademark ... [and] agreed to sell plaintiffs Shell motor fuel products for sale under said trademark with the understanding that said Shell products would be the only motor fuel products sold by plaintiffs during the term of a lease to be entered into between plaintiffs and defendant."

In paragraph 2 of that Count, plaintiffs allege that "in December, 1981, plaintiffs Jack R. Hanes and Wilma M. Hanes, individually and as agents for plaintiff Jack C. Hanes, entered into a contract with defendant Mid-America Petroleum, Inc., which authorized plaintiffs to occupy leased marketing premises located at Interstate 70 and Route J, Nelson, Missouri, which premises were to be employed in connection with the sale of motor fuel supplied by Shell Oil Company and distributed by Mid-America Petroleum, Inc."

Plaintiffs further allege that, on or around November 9, 1982, defendant removed the Shell signs installed on the premises and removed all motor fuel from the underground pumps located on said premises; that this was done without any notification and without proper grounds; and defendant thereby terminated plaintiffs' franchise in violation of the provisions of 15 U.S.C. § 2804.

### B.

The files and records before the Court establish a number of undisputed facts: Defendant Mid-America Petroleum, Inc., is a jobber for Shell Oil Company and as such was authorized by Shell to permit the resale of motor fuel products by others under the Shell Oil Company trademark (Stip. ¶ 3). Although Shell is the primary refinery utilized by defendant for the purchase of motor fuel to sell, consign, or distribute to others, defendant does utilize certain other refiners (Taylor Dep. p. 15; Stip. ¶ 4).

The subject property in Nelson, Missouri is owned by Arlene Moll. Under a lease, defendant rents the premises from Arlene Moll for $750.00 per month. The lease provides that defendant lessee may, without the consent of the lessor, sublet or assign the lease (Def. Suggestions in Support, Exh. A).

Under some oral arrangement or agreement with defendant's Vice President Clint J. (Pat) Duff, plaintiff Jack C. Hanes entered the service station premises in August of 1981. Jack C. Hanes in an affidavit states that he and Clint J. Duff agreed in late August, 1981 that Hanes would operate the station for the purpose of retail sale of Shell Oil Company petroleum products under the Shell trademark, pay defendant two hundred and fifty Dollars ($250) per month rent for the station, and purchase Shell Oil Company petroleum products from defendant. (Jack C. Hanes Aff. ¶ 3).

Clint J. Duff died on August 16, 1982 and, during discovery, defendant asserted the Missouri Dead Man's Statute in relation to any oral agreement that might have existed. It is, however, undisputed that Duff, in his position with defendant, had the responsibility of running Mid-America Petroleum. His duties entailed overseeing the collection of moneys from dealers, taking orders from dealers for petroleum products and negotiating dealer contracts (Evans Dep. pp. 58-9). No other employee, agent or representative of defendant is currently aware of any oral contract between defendant and plaintiffs concerning the occupancy of the service station premises or the distribution of motor fuel products for sale from that station. Defendant "assumes" that Hanes entered the premises on August of 1981 under some oral ar-

rangement with Duff (Def's Suggestions in Support at 1) and concedes that "unquestionably there was an arrangement" (Def's Suggestions in Opposition at 1).

It is undisputed that from September 14, 1981 to October 8, 1982 defendant sold and delivered motor fuel products to plaintiffs at the service station premises (Stip. ¶ 1). The service station was operated during that period of time under the Shell trademark, plaintiffs were required to pay defendant for the products and submit a $250 monthly rental payment to defendant (Evans Dep. Exhs. # 2–11).

Plaintiffs began operation of the station without any written agreement or lease. In November or December of 1981, Jack C. Hanes received a proposed lease from defendant (Jack C. Hanes Aff. ¶ 6). In early December, 1981, one Jerome Taylor delivered another copy of the proposed lease to Jack C. Hanes but the copy of that lease bore Taylor's signature. It is undisputed that at the time Jerome Taylor delivered the copy of the lease to Jack C. Hanes, Taylor was not an employee of defendant and that he delivered the copy of the lease to Hanes simply as a favor to Duff who was ill at the time.

The lease with Taylor's signature was dated December 1, 1981; stated that the term of the lease was from December 1, 1981 to December 1, 1982; provided for a $250.00 monthly rental; had provisions for the payment for gas delivered by defendant to the premises; had "NONE" written in the space for security deposit; and had lines drawn through the blanks reserved for the hours lessee would be required to keep the station open. The copy of that lease signed by Taylor was never signed by any of the plaintiffs (Complaint, Exh. A).

On December 20, 1981, Jack C. Hanes' mother and father, plaintiffs Wilma M. Hanes and Jack R. Hanes, signed the other copy of the lease. The signature of Clint J. Duff appeared on that lease (Stip. ¶¶ 11 and 16, Exh. B). The form of that lease was identical to the form of the lease signed by Jerome Taylor. More spaces, however, were left blank. The form contained certain typewritten provisions and was entitled "ONE YEAR PROBATIONARY DEALER LEASE." The lease states in part:

THIS IS A LEASE dated 12–1, 1981, between Mid-America Petroleum, Inc., a Missouri corporation, with offices at Washington, Missouri ("MAP"), and Jack Haines, d/b/a Jack Haines Shell Station of Nelson in Nelson Missouri (Lessee).... [Underlined portions indicate blank spaces with handwritten completions.]

1. LEASE. MAP hereby leases to Lessee, and Lessee hereby leases from MAP, the automobile service station premises located at I–70 and Route J, Nelson, Missouri 65347, including the land there owned or leased by MAP, to the extent now occupied and used for automobile service station purposes, and the buildings, improvements, and equipment now comprising the service station on the land (collectively "Premises"). Lessee acknowledges receipt of the Premises in good and safe condition and repair.

2. TERM. This Lease shall be in effect for the term beginning on _____, 1981, and ending on _____, 1982 ....

3. RENT. Lessee shall pay MAP, as rent for each calendar month, the sum of $250.00, due in advance the 1st of each month ....

EXECUTED as of the date first herein specified.

That lease contained various other blank spaces that were never filled in, including the amount of security deposit and the operating hours of the station. At the bottom of the lease there appears a signature space for "Jack Haines Shell Station, By Jack Haines" and "Mid-America Petroleum, Inc., By Clint J. Duff, Jr., Vice President." As stated above, Duff's signature appears in the proper space. The space for "Jack Haines" is left blank but underneath that space there appears the signature of Jack R. Hanes and Wilma M. Hanes along with handwriting which reads "Executed

as of this December 20, 1981" and "correction on name of Haines is Hanes."

The files and record in this case also establish that plaintiffs invested a substantial amount of money in the service station. Jack C. Hanes invested approximately $5,450.00 in the station from September, 1981 to October, 1982. After October, 1982, Jack C. Hanes invested an additional $1,250.00 in the business (Affidavit of Jack C. Hanes). In the initial thirteen month period, Jack R. Hanes and Wilma Hanes borrowed and invested $5,000.00 in the service station; since October, 1982, they borrowed and invested an additional $2,500.00, and in the spring of 1983, Jack R. Hanes cashed in insurance policies and invested, out of the proceeds, $1,000.00 (Affidavits of Jack R. Hanes and Wilma M. Hanes).

As stated above, in the initial thirteen month period, from September 14, 1981 to October 8, 1982, defendant sold and delivered motor fuel products at the service station premises (Stip. ¶ 1), charging plaintiffs for the product and for rent. In late October, 1982, Jack C. Hanes attempted to order additional petroleum from defendant but defendant refused to supply plaintiffs any additional petroleum products.

During 1982, Shell Oil Company received six customer complaints concerning services provided to those customers by plaintiffs, and defendant promptly notified plaintiffs of those complaints (Stip. ¶ 6). Also during 1982, numerous checks drawn on plaintiffs' checking accounts made payable to Mid-America Petroleum were designated "Returned Not Paid Because NSF" or "Returned Not Paid NSF" (Stip. ¶¶ 14 and 15). In September of 1982, a meeting was held between employees of defendant, Jack C. Hanes and his lawyer. Plaintiffs were at that time advised that no further customer complaints could be tolerated.

On November 11, 1982, after receiving another customer complaint, defendant removed the Shell signs from the premises occupied by plaintiffs (Stip. ¶ 8). Thus, by November 11, 1982, plaintiffs were no longer receiving motor fuel products from defendants and were no longer "flying the Shell flag" at their station.

Plaintiffs, however, continued to occupy the premises and, on March 1, 1983, defendant sent plaintiffs a certified letter which was received by them on March 4, 1983 (Stip. Exh. A). The letter, signed by Jerome Taylor, who by that time was employed by defendant, stated:

At the beginning of the year, I mailed a copy of a proposed lease to you and we did not hear from you. Also, I have not received January or February rent for the Nelson station.

\* \* \* \* \* \*

This letter is serving you 30 days notice to vacate our Nelson station.

Plaintiffs eventually paid the January, February, March and April, 1983 rent on April 26, 1983. Since that time, however, no other rent payments have been made although plaintiffs still occupy the premises. (Stip. ¶ 12).

## IV.

The most difficult question in this case is whether a franchise existed between the parties. The undisputed facts clearly establish that defendant was a distributor under the PMPA. Defendant purchases "motor fuel for sale, consignment, or distribution to another." 15 U.S.C. § 2801(6)(A). It is also clear that plaintiffs were retailers under the PMPA. "The term 'retailer' means any person who purchases motor fuel for sale to the general public for ultimate consumption." 15 U.S.C. § 2801(7).

The question presented is whether there was any oral or written agreement between plaintiffs and defendant that could be said to constitute a franchise within the meaning of the PMPA. In determining that question, this Court must keep in mind that "[a]s remedial legislation, the Act must be given a liberal construction consistent with its overriding purpose to protect franchisees." *Brach v. Amoco Oil Co.*, 677 F.2d 1213 (7th Cir.1982).

## A.

■ Plaintiffs contend that a written agreement existed between plaintiffs and defendant in the form of the lease signed by Clint J. Duff, Jr. and Wilma and Jack R. Hanes. In Missouri, a lease must contain: (1) the parties; (2) the subject matter; (3) the promises on both sides; (4) the price; and (5) the consideration. *Midland Realty Co. v. Manzella*, 308 S.W.2d 326, 330 (Mo. App.1957). Moreover, "it is the general rule and the law in Missouri that 'A written agreement may be uncertain because of blanks left therein,' . . . and that 'A writing is incomplete as an agreement where blanks, as to essential matters, are left in it unless they can be supplied from other parts of the writing itself.'" (citations omitted) *Bengimina v. Allen*, 375 S.W.2d 199, 203 (Mo.App.1964); *cited in Damon Alarm Corp. v. Economic Development Corp.*, 555 S.W.2d 694, 695 (Mo.App.1977).[6] In addition, a lease must be signed by the parties or their agents. R.S.Mo. § 441.060.

■ The lease in this case falls far short of meeting those requirements. The blanks for the term of the lease were not filled in. There is no way to determine when the term of the lease was to begin or end. The lease is entitled a "One-Year Probationary Dealer Lease" so it is obvious that the length of its term was meant to be one year but there is no indication of when this one year period was to commence. The term of a lease is obviously an essential element and its absence renders the lease invalid. Moreover, many other blanks regarding various terms of the lease were also not completed. In short, the lease was an incomplete instrument as to essential terms and there was thus no written agreement between the parties.

■ Plaintiff further contends, however, that we must read that incomplete lease together with the identical form lease deliv-

ered to plaintiffs and signed by Jerome Taylor. While it is true that a lease may consist of more than one writing, the document signed by Jerome Taylor cannot be considered together with the document signed by Duff and Wilma and Jack R. Hanes because it bears no signature of any party. *Midland Realty Company v. Manzella, supra.* None of the plaintiffs signed that document and Jerome Taylor, at the time he signed that lease, had no authority to sign for defendant. It is therefore improper to consider the two documents together as constituting one lease.

Concerning the lease signed by Duff, there is also a substantial question whether it was signed by the proper named lessee, or his agent. The lease was delivered to Jack C. Hanes for his signature but his parents signed the lease. Since we have already determined that the lease is incomplete and did not constitute an agreement, even assuming that it was properly signed, it is unnecessary to determine whether, under the facts of this case, the lease met the signature requirements of R.S.Mo. § 441.060.

## B.

As an alternative ground, plaintiffs contend that an oral agreement existed between plaintiff Jack C. Hanes and defendant's Vice President Clint J. Duff which created a franchise under the PMPA. Defendant has at all times denied that an agreement existed and has asserted the Missouri Dead Man's Statute, R.S.Mo. § 491.010, to prevent the development of any evidence concerning any oral agreement. In response to that argument, plaintiffs contend that under Rule 601 of the Federal Rules of Evidence, the Missouri Dead Man's Statute does not apply. Rule 601, which sets forth the general rule of competency of witnesses, states:

> Rather, since the plaintiffs allege that a written lease did exist between the parties, it is necessary for us to determine if the essentials of a written lease were present. To do this, it is appropriate to refer to Missouri cases which deal with written leases.

**6.** Plaintiffs contend that this written agreement does not come under the Statute of Frauds and that these standards for written leases are therefore not applicable. This Court does not have to reach the Statute of Frauds question—that is, whether the lease was required to be in writing.

Every person is competent to be a witness except as otherwise provided in these rules. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law.

Courts that have been faced with the question of whether a State Dead Man's Statute applies in a federal case have applied the State law in diversity cases but have refused to apply it in federal question cases. *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1051 (7th Cir. 1977), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); *Wagner v. Tucker*, 517 F.Supp. 1248, 1250 (S.D.N.Y. 1981); *Turbyfill v. International Harvester Co.*, 486 F.Supp. 232, 235 (E.D.Mich. 1980); *Pennsylvania National Bank & Trust Co. v. American Home Assurance Co.*, 87 F.R.D. 152, 155 (E.D.Pa.1980); *Donaldson v. Hovanec*, 473 F.Supp. 602, 610 (E.D.Pa.1979); *Super Valu Stores v. First National Bank*, 463 F.Supp. 1183, 1192 (M.D.Ga.1979); *United States v. Diehl*, 460 F.Supp. 1282, 1289 (S.D.Tex. 1978); *Chase v. Groff*, 410 F.Supp. 602, 608 (E.D.Pa.1976), *aff'd.* 556 F.2d 565 (3rd Cir. 1977).

■ While it is generally true that State competency rules will be applied in diversity cases and the Federal Rules of Evidence will be applied in federal question cases, Rule 601 is not based on a diversity/non-diversity distinction. The proper analysis under that Rule is whether State law supplies the rule of decision with respect to the particular claim or defense at issue. If so, State competency rules apply. If federal law supplies the rule of decision, federal competency rules apply.

In determining whether a rule of decision is State or federal, it is first necessary to determine whether the right has its source in federal or State law. Since the present case is a federal question case, the source of the right is federal. That being so, State law does not operate of its own force. *Burks v. Lasker*, 441 U.S. 471, 99 S.Ct.

1831, 60 L.Ed.2d 404 (1979). This does not mean, however, that State law is necessarily irrelevant; as with many federal question cases, the content of the federal right may be determined by reference to State law to give meaning to certain interstices or gaps in the federal legislation.

To fill in gaps in federal legislation, it is necessary either to fashion a uniform federal rule or adopt State laws which may vary from State to State. In making a choice between these two options, it is necessary to consider: (1) the need for uniformity throughout the nation; (2) whether application of a State law would conflict with the federal policy underlying the federal law; and (3) whether a uniform federal rule displacing State law would disrupt an area of traditional local concern. *Burks v. Lasker, supra; United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973). *See* Note, *Adopting State Law as the Federal Rule of Decision: A Proposed Test*, 43 U.Chi.L.Rev. 823 (1976).

The PMPA was enacted to provide a "single, uniform set of rules governing the grounds for termination and non-renewal of motor fuel marketing premises," S.Rep. No. 731, 95th Cong., 2d Sess., *supra*, at 19, U.S.Code Cong. & Admin.News 1978, p. 877, and therefore any State law or regulation concerning termination or non-renewal is preempted unless it is the same as the PMPA. 15 U.S.C. § 2806. Thus, uniformity is specifically mandated by the PMPA in regard to termination and non-renewal but, in regard to other aspects of the franchise relationship, the need for uniformity is less apparent. Under the facts of this case, it is clear that, in regard to determining whether an oral agreement existed between the parties, a uniform federal rule is not needed.

In addition, regulation of the franchise relationship has traditionally been a matter of local concern in which the parties frame their relationships with reference to State law. While the PMPA adds a layer of

rights and obligations upon the franchise relationship, it was not intended to totally displace State law principles which do not specifically apply to the termination or non-renewal of the franchise. 15 U.S.C. § 2806.

Moreover, and possibly most importantly, reference to State law to determine whether an oral agreement existed between the parties would not conflict with the policies underlying the PMPA. Therefore, in the present case, reference to Missouri law to fill in those gaps is both appropriate and helpful. *See Brach v. Amoco Oil Co.*, 677 F.2d 1213 (7th Cir.1982); *Rogue Valley Stations, Inc. v. Birk Oil Company*, 568 F.Supp. 337 (D.Or.1983).

The fact that reference to Missouri contract law principles is appropriate in order to give meaning to the PMPA's definition of a contract as "any oral or written agreement" does not mean that, for purposes of Rule 601, State law supplies the rule of decision on that issue. In a federal question case such as this, when State law is used to fill in the gaps of the federal legislation, State law is incorporated as the federal rule of decision. *United States v. Kimbell Foods, supra*, 440 U.S. at 728, 99 S.Ct. at 1458. *See Burks v. Lasker, supra; Auto Workers v. Hoosier Cardinal Corp.*, 383 U.S. 696, 701–03, 86 S.Ct. 1107, 1110–11, 16 L.Ed.2d 192 (1966); *United States v. Yazell*, 382 U.S. 341, 356–57, 86 S.Ct. 500, 508–09, 16 L.Ed.2d 404 (1966); *DeSylva v. Ballentine*, 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956).

The precise question presented was considered by the Conference Committee considering the wording of Rule 601 in House Report No. 93–1597 *reprinted in* 1974 U.S. Code Cong. & Adm.News 7051, 7098. In the Notes accompanying the Rules,[7] the Conference Committee stated that, in a non-diversity case, "[w]hen a federal court chooses to absorb state law, it is applying state law as a matter of federal common law. Thus, state law does not supply the rule of decision (even though the federal court may apply a rule derived from state decisions) ..." *Id.* at 7101. *See* C.A. Wright, *Federal Courts*, § 93, p. 626 (4th ed. 1983); Wright and Graham, *Federal Practice and Procedure*, Vol. 23, § 5433 (1980).

■ We conclude that, under Rule 601, federal competency standards apply and that the Missouri Dead Man's Statute therefore is not applicable. Since the Federal Rules of Evidence do not contain a provision disqualifying a party from testifying about a contract where the other party to the contract is dead, it is appropriate to consider evidence of an agreement between Hanes and Duff, even though Duff is deceased.

Plaintiff Jack C. Hanes states in an affidavit that he operated the station pursuant to an oral agreement with Duff. That agreement provided that Hanes would operate the station for the purpose of retail sale of Shell Oil Company petroleum products under the Shell trademark, pay Mid-America Petroleum two hundred and fifty dollars ($250) per month rent for the station, and purchase Shell Oil Company petroleum products from Mid-America Petroleum. Defendant argues, of course, that Duff is now deceased and no other employee or agent of defendant is aware of any oral agreement with Hanes.

■ Ordinarily, a self-serving statement by one party to a purported oral contract where the other party is deceased may not have sufficient weight to prove the existence of a contract. In the present case, however, since the parties were performing their obligations under the agreement for more than twelve months, we have before us substantial undisputed facts supporting the statements of Hanes. Jack

---

7. In the notes accompanying Rule 601, the Conference Committee stated that the wording of Rule 601 was adopted for reasons similar to those underlying Rule 501 which deals with privileges of a witness. Both Rules contain, in pertinent part, identical language ("in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision ...".) It is therefore appropriate to examine the notes accompanying Rule 501 to determine the meaning of that phrase.

C. Hanes occupied and operated the station in question with the knowledge and consent of defendant and paid $250 per month in rent to defendant. Defendant sold and delivered Shell Company petroleum products to Hanes and Hanes, in turn, sold the products under the Shell trademark. Thus, there is substantial evidence in the record to support plaintiffs' statement that an agreement in fact existed between defendant and Jack C. Hanes.

Defendant concedes that those facts are true (Stip. ¶ 1, 3 and 5; Evans Dep. pp. 97–99) and that there was some arrangement between Duff and Hanes. (Def's Sugg. in supp. at 1; Def's Sugg. in opp. at 1). It is significant that defendant has not attempted to place any facts in evidence to show that the oral arrangement between the parties was something less than a franchise relationship under the PMPA.

We therefore find and conclude that a franchise within the meaning of the PMPA existed between the parties based on an oral contract and the undisputed factual circumstances relating to the parties' course of conduct. The arrangement of the parties created a landlord-tenant relationship between defendant and Jack C. Hanes. Jack C. Hanes became a tenant from month-to-month of defendant whose tenancy, even without the added protection of the PMPA, could not be terminated under Missouri law except by giving one month's notice in writing. R.S.Mo. § 441.-060. Since the parties' agreement also provided that defendant would supply Shell Company petroleum products to Hanes' station and that Hanes was authorized or permitted to sell the products under the Shell trademark, those circumstances created a franchise under the PMPA. 15 U.S.C. § 2801(1)(A).

A franchise under the PMPA is not limited to situations where there is a valid long term written lease and agreement between the parties. The PMPA expressly provides that a franchise may exist on the basis of an oral agreement. Further, the PMPA has been found to be applicable where there is no more than a month-to-month tenancy. *Brach v. Amoco Oil Co., supra,* at 1213. Accordingly, the tenancy between the parties here, when considered in light of the other undisputed factual circumstances of this case, must be held to be sufficient to establish a franchise within the meaning of the PMPA.

### V.

Title I of the PMPA provides that franchisors may terminate any franchise if proper notice is given to the franchisee and there exist proper grounds for termination under the Act. 15 U.S.C. § 2802(b)(1)(A) and (B). Notice *and* proper grounds are required. S.Rep. No. 95–731, 95th Cong., 2d Sess. 33 (1978), *reprinted in* 1978 U.S. Code Cong. & Admin.News 873, 891.

 In every case under the PMPA, there must be strict compliance with the notice provisions of the PMPA. *Escobar v. Mobil Oil Corp.,* 678 F.2d 398, 400 (2nd Cir.1982); *Thompson v. Kerr-McGee Refining Corp.,* 660 F.2d 1380, 1390 (10th Cir.1981); *Mobil Oil Corp. v. Clark,* 652 F.2d 2, 3 (8th Cir.1981). Proper notice of termination requires that notification be given to the franchisee in the manner described in 15 U.S.C. § 2804(c) and, except as provided in 15 U.S.C. § 2804(b), notice must be given not less than 90 days prior to the date on which such termination takes effect. The manner and form of notification is described in 15 U.S.C. § 2804(c).[8]

 In the present case, it is undisputed that no written notice of the termination was given to plaintiffs ninety days in advance of the termination as required by the

---

**8.** Notification under this section—
(1) shall be in writing;
(2) shall be posted by certified mail or personally delivered to the franchisee; and
(3) shall contain—

(A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefore;
(B) the date on which such termination or nonrenewal takes effect; and
(C) the summary statement prepared under subsection (d) of this section.

Act. On September 14, 1982, defendant orally informed Hanes that no more customer complaints would be tolerated and, on November 11, 1982, without any further notice, the franchise was, for all practical purposes, terminated by defendant when it removed the Shell sign from the premises and thereafter refused to supply plaintiffs with any additional Shell motor fuel products. Defendant contends that the ninety day requirement did not have to be adhered to and that defendant need only have furnished notice at the earliest date practicable. Moreover, defendant states that oral notice given to plaintiffs on September 14, was adequate because, under the circumstances, there was no need for written notice. We disagree.

The 90 day requirement must be met in every case except "[i]n circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than 90 days prior to the date on which termination ... takes effect." 15 U.S.C. § 2804(b)(1). If such a situation exists, however, the franchisor "shall furnish notification to the franchisee ... on the earliest date on which furnishing of such notification is reasonably practicable." 15 U.S.C. § 2804(b)(1)(A).

We find and conclude that the exception to the 90-day notice requirement clearly does not apply under the facts of this case. The test is one of reasonableness and here it was not impractical or unreasonable to give the full 90-day notice.

Defendant's construction of the exception would enable franchisors to avoid the 90-day requirement any time customer complaints or insufficient funds checks were received by the franchisor. Congress did recognize that these events may be detrimental to a franchise relationship and provided that these events are proper grounds for termination, 15 U.S.C. § 2802, but the existence of those events does not excuse the franchisor from adhering to the 90-day requirement. Allowing the franchisor to avoid the requirement merely because proper grounds are alleged would

eliminate the 90-day requirement altogether.

In addition to the defect under the 90-day requirement, the oral notice given to plaintiffs on September 14, 1982 was inadequate under the PMPA because it did not meet the strict notification requirements of 15 U.S.C. § 2804(c). At a minimum, proper notice must be in writing; posted by certified mail or personally delivered; and must contain a statement of intention to terminate together with the reasons therefor, the date on which the termination would take effect and a summary statement of the provisions of the Act. Defendant's purported notice to plaintiffs was wholly inadequate with respect to each of these requirements.

Although defendant does not raise the point, it is necessary to discuss the effect of the March 4, 1983 letter sent to plaintiffs by defendant. That letter gave plaintiffs thirty days notice to vacate the station premises. It is apparent that the letter can in no way be construed as proper notice under the PMPA. It was sent to plaintiffs almost four months *after* the franchise was terminated. Moreover, although it was in writing and sent by certified mail, it did not contain any reasons for termination or a summary of the provisions of the PMPA.

Thus defendant improperly terminated plaintiffs' franchise and plaintiffs are accordingly entitled to have their franchise reinstated, subject, of course, to a later termination consistent with applicable law. Since the notice was inadequate, it is not appropriate that we determine whether defendant may have had proper grounds to terminate the franchise. The Act requires both notice and proper grounds. Defendant failed to give adequate notice and plaintiffs are thus entitled to relief regardless of whether defendant had proper grounds. We therefore do not reach any question concerning proper grounds for termination.

VI.

The PMPA provides that, if a franchisor fails to comply with the requirements of § 2802, and the franchisee timely brings an

**648**

action based on such failure, the Court shall grant such equitable relief as is necessary to remedy the effects of such failure. 15 U.S.C. § 2805; *Clark v. Mobil Oil Corp.*, 496 F.Supp. 132 (E.D.Mo.1980), *aff'd.* 652 F.2d 2 (8th Cir.1981). Under the circumstances of this case, it is necessary that defendant be required to reinstate plaintiffs' franchise on the same terms as existed before the improper termination. The franchise, as reinstated, will, as we have stated, be subject to defendant's right to terminate the franchise on the grounds set forth in 15 U.S.C. § 2802.

In order to ensure that both sides get a fresh start on this franchise relationship, counsel for both sides shall confer and agree upon a proposed form of order which will properly reinstate the franchise relationship as required by the judgment for plaintiffs in this matter on the issue of liability under the PMPA.

Accordingly, it is

ORDERED (1) that the issue of liability under the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, *et seq.*, heretofore separated for determination pursuant to Rule 42(b) of the Federal Rules of Civil Procedure should be ruled in favor of the plaintiffs and against the defendant. It is therefore further

ORDERED (2) that defendant's motion for partial summary judgment on the separated issue should be and is hereby denied. It is further

ORDERED (3) that plaintiffs' motion for partial summary judgment on the separated issue should be and is hereby granted. It is further

ORDERED (4) that within twenty (20) days of the date of this Order, counsel for the parties shall confer and agree upon:

(a) a form of proposed Order which would accomplish the reinstatement of the franchise between plaintiffs and defendant on the same terms as existed before the improper termination; and

(b) an agenda for a conference with the Court to determine how the issue of PMPA damages, if any, should be determined.

The agreed agenda shall also include counsels' agreement or a statement of their separate views in regard to the manner in which plaintiffs' remaining counts and defendant's counterclaim should be processed in light of the Court's determination of the separated issue as above stated.