

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

DEREK FUEMMELER, ET AL., )
)
Appellants, )
)
v. ) WD86868
)
MIKE AND MARK FARMS, LLC., ET AL., ) Opinion filed: December 17, 2024
)
Respondents. )

**APPEAL FROM THE CIRCUIT COURT OF
BOONE COUNTY, MISSOURI
THE HONORABLE JEFF HARRIS, JUDGE**

Special Division: Alok Ahuja, Presiding Judge,
Mark D. Pfeiffer, Judge and W. Douglas Thomson, Judge

Derek Fuemmeler and Steven Cleeton, d/b/a F&C Family Farms (collectively, "Tenants") appeal from a judgment in which the trial court denied their motion for summary judgment and granted summary judgment in favor of Mike and Mark Farms, LLC, Michael A. Tregnago, as Trustee of the Michael A. Tregnago Revocable Living Trust Agreement dated January 8, 2020, Marc Tregnago, and Heather Tregnago (collectively, the "Tregnago Defendants"), as well as John and Cindy Winkleblack, Trustees of the Winkleblack 401(k) Plan (the

"Winkleblacks"). Tenants raise five Points on Appeal. We reverse and remand for further proceedings.

## Factual and Procedural History

This appeal arises from two consolidated lawsuits concerning two leases entitled "Cash Lease of Farm Land, Buildings and Equipment" (collectively, the "Leases") entered into between Tenants and Mike and Mark Farms, LLC (the "LLC").

The first Lease was entered into on February 27, 2021 (the "Browning Farm Lease"). The property subject to the Browning Farm Lease is described in the Lease as follows: "[P]roperty, located in *Randolph* County, State of *Missouri*, and commonly known as *Browning Farm . . .* and consisting of *90-120* acres, more or less[.]"[1] In addition to the right to farm the ground, the Browning Farm Lease provides Tenants the hunting rights on the Browning Farm, without reservation. No land or buildings on the Browning Farm are reserved for use by the LLC. The Lease provides that *"[t]illable acres will be paid on. More to be added as clearing happens."* Cash rent was to be paid in the amount of $130 per acre "*at Fall Harvest time no later than*" December 1st. The Browning Farm Lease provides for a five-year term from January of 2021 to January of 2026, and is signed by Marc

---

[1] The quoted italicized language indicates the handwritten portion of what was otherwise a form lease. Further italicized language in the Factual and Procedural History evidences the same.

We recognize this reference to 90-120 acres appears at odds with our later statement in this paragraph that it is uncontroverted the Browning Farm consists of approximately 141 acres. As we discuss fully, *infra*, the 90-120 acre reference appears to be indicative of the rent calculation model agreed to by the parties.

Tregnago and Tenants. It is uncontroverted that the Tregnago Defendants accepted rent under the terms of the Browning Farm Lease for both 2021 and 2022. The property subject to the Browning Farm Lease had originally been sold by David and Barbara Browning. It is uncontroverted that the subject property consists of 141 acres, more or less, and in referring to the "Browning Farm" both Tenants and the Tregnago Defendants understood what property was included in, and subject to, the Browning Farm Lease.[2]

The second Lease was entered into on November 1, 2021 (the "Higdon Farm Lease"). The property subject to the Higdon Farm Lease is described in the Lease as follows: "[P]roperty, located in Howard County, State of *MO*, and commonly known as *Higdon Farm* and consisting of *50/CRP acres, more or less*[.]"[3] As with the Browning Farm Lease, the Higdon Farm Lease grants Tenants the hunting rights on the Higdon Farm, without reservation, and no land or buildings on the

_____

[2] Respondents responded to this latter statement within Tenants' statement of uncontroverted material facts by asserting, "Admit that a year-to-year lease was entered into between the parties, but deny that the property is commonly known as the 'Browning Farm'." In support of their response, Respondents cited to paragraph 5 of the Supplemental Affidavit of Michael Tregnago, which states, "To my knowledge, the property purchased by Michael A. Tregnago, Trustee of the Michael A. Tregnago Revocable Living Trust Agreement dated January 8, 2020, from David A. Browning and Barbara Melissa Browning, is not generally and commonly known as the 'Browning Farm' in the community." Even assuming the Browning Farm was not *generally and commonly known* as such in the community, that does not contradict that both *Tenants and the Tregnago Defendants* understood what property was included in, and subject to, the Browning Farm Lease by the reference to the "Browning Farm." *See Yes Chancellor Farms, LLC v. Merkel*, 670 S.W.3d 214, 223 (Mo. App. E.D. 2023). As such, Respondents' response to Tenants' paragraph did not comply with Rule 74.04(c)(2) and is therefore an admission of the truth of that paragraph. *Id.*; Rule 74.04(c)(2).

[3] The parties appear to agree that "50/CRP" denotes that approximately 50 acres of the Higdon Farm are able to be farmed, with much of the remainder having been placed in the USDA's Conservation Reserve Program, and thus not able to be farmed.

Higdon Farm are reserved for use by the LLC. The Lease further provides that "*[t]illable acres will be figured by GPS.*" Cash rent was to be paid in the amount of $150 per acre by November 15th. The Higdon Farm Lease provides for a five-year term from April 1, 2022 to March 31, 2027, and is signed by Michael Tregnago and Tenants. It is uncontroverted that the Tregnago Defendants accepted rent under the terms of the Higdon Farm Lease for 2022. The property subject to the Higdon Farm Lease had originally been sold by the Higdons.[4] It is uncontroverted that the subject property consists of 138.87 acres, more or less, but in referring to the "Higdon Farm," both Tenants and the Tregnago Defendants understood what property was included in, and subject to, the Higdon Farm Lease.[5]

## A. 22BA-CV03849 ("Case 1")

On August 1, 2022, counsel for the Tregnago Defendants sent Tenants a letter purporting to terminate both Leases prior to their natural expiration (the "Notice of Termination"). This Notice of Termination stated the "leases are a

---

[4] The summary judgment record reflects that the property was sold by John R. Higdon, the Successor Trustee of the Virginia R. Higdon Revocable Living Trust dated August 7, 1997. For the sake of clarity, we will refer to the seller as the Higdons.

[5] Respondents responded to this latter statement within Tenants' statement of uncontroverted material facts by asserting, "Admit that a year-to-year lease was entered into between the parties, but deny that the property is commonly known as the 'Higdon Farm'." In support of their response, Respondents cited to paragraph 4 of the Supplemental Affidavit of Michael Tregnago, which states, "To my knowledge, the property purchased by [the LLC], from John R. Higdon, Successor Trustee of the Virginia R. Higdon Revocable Living Trust dated August 7, 1997, is not generally and commonly known as the 'Higdon Farm' in the community." Again, even assuming the Higdon Farm was not *generally and commonly known* as such in the community, that does not contradict that both *Tenants and the Tregnago Defendants* understood what property was included in, and subject to, the Higdon Farm Lease by the reference to the "Higdon Farm." *See Merkel*, 670 S.W.3d at 223. As such, Respondents' response to Tenants' paragraph is an admission of the truth of that paragraph, as explained *supra* note 1.

4

violation of the Missouri statute of fraud[s]" and are therefore "nothing more than oral farm leases and tenancies at will, which are generally treated as year to year leases under Missouri law." The Notice of Termination provided Tenants "must be completely removed from the property on or before February 28, 2023."

Tenants, through counsel, responded to the Notice of Termination on August 16, 2022 (the "Response Letter"). The Response Letter stated Tenants would not be vacating the farms on February 28, 2023, and would "continue to maintain possession of the respective properties for the remainder of the lease terms." The Response Letter asserted "[t]he purported notice of termination set forth in the August 1, 2022 letter is null, void and contrary to the plain terms of the leases. Each of the leases at issue is a valid, legally enforceable lease."

Subsequently, on October 11, 2022, Tenants initiated Case 1 by filing a petition against the Tregnago Defendants in seven counts. Important for our purposes are Tenants' Counts I, II, and III.[6] Under Count I (Breach of Lease – Specific Performance), Tenants alleged that each of the Leases is a valid and enforceable lease that provides for a five-year term. Tenants also alleged that they have fully performed their obligations under the Leases, but despite their full and complete performance, the Tregnago Defendants "have purported to terminate

---

[6] Counts IV-VII concern a separate contractual dispute between Tenants and the Tregnago Defendants for payment for labor, services, equipment and materials provided by Tenants for improvements on the Tregnago Defendants' properties. Specifically, those counts were for Breach of Contract (Count IV), Petition on Account (Count V), Quantum Meruit (Count VI), and Unjust Enrichment (Count VII). These counts were later resolved, leaving only Counts I-III of the Case 1 petition to be addressed by this Court.

each of the Leases as of February 28, 2023." Tenants alleged this was a material breach of the respective Leases and therefore requested a judgment ordering "Defendants specifically perform each of the Leases by providing [Tenants] with possession of each of the Farms for the remainder of the term of each Lease . . . ."

Tenants raised the same allegations in Count II (Breach of Lease – Damages) regarding the validity of the Leases, Tenants' performance under them, and the Tregnago Defendants' material breach of the Leases, but Tenants also included allegations that they "have incurred, and will continue to incur, substantial damages resulting from Defendants' wrongful termination of the Leases." Tenants thus requested a judgment "in an amount to be proven at trial, for pre-judgment and post-judgment interest at the highest rate allowed by law and which awards [Tenants] their costs incurred herein and for such other and further relief as the Court deems just and proper under the circumstances."

In Count III (Declaratory Judgment), Tenants alleged a "justiciable controversy . . . exists regarding the rights and responsibilities of the parties with respect to the Leases" and that "[j]udicial resolution of the parties' rights and responsibilities with respect to the foregoing issues will eliminate future uncertainty." Tenants therefore requested a judgment declaring that the Leases are valid and enforceable, that their purported termination is null and void, that Tenants retain possession of the farms in accordance with the respective Leases for the remainder of the respective lease terms, and awarding Tenants theirs costs, expenses, and other and further relief as deemed just and proper by the court.

6

The Tregnago Defendants filed their answer and included therein an affirmative defense that Tenants' "claims are barred by the statute of frauds, Section 432.010, RSMo., in that the subject leases are all voidable because they fail to provide an accurate legal description of the leased land or to otherwise adequately describe or identify the subject real estate." It was further claimed that because of the statute of frauds, the Leases are all year-to-year leases, meaning that the Tregnago Defendants "properly terminated them by giving notice to [Tenants]."

Also included within the Tregnago Defendants' answer was a two-count counterclaim (hereinafter, the "Tregnago Counterclaim"). Relevant here is Count 2 of the Tregnago Counterclaim for "Declaratory Judgment/Ejectment."[7] Within said count, the Tregnago Defendants alleged Tenants have only year-to-year leases. Accordingly, the Tregnago Defendants alleged "[a] justiciable controversy exists regarding the rights and responsibilities of the parties" and sought a judgment in their favor and against Tenants, jointly and severally, ordering Tenants to be removed from the subject properties on or before February 28, 2023, and for costs, expenses, and other relief as the court deems just and proper.[8]

---

[7] Count 1 of the Tregnago Counterclaim was for "Damage to Property/Private Nuisance." Said count was later resolved, leaving only Count 2 of Tregnago Counterclaim to be addressed by this Court.

[8] Somewhat confusingly, Count 2 of the Tregnago Counterclaim refers generally to "Defendants" throughout, including in requesting "a judgment in their favor and against [Tenants] that orders the [Tenants] off the subject properties of Defendants on or before February 28, 2023," but then refers only to the LLC in the prayer for relief. While we recognize this failure in pleading, we need not resolve it here.

## B. 23BA-CV00568 ("Case 2")

On February 13, 2023, Case 2 commenced when Tenants filed a verified petition against the Winkleblacks, D&L Farming, LLC ("D&L Farming"), and Leslie Edwards ("Edwards") (collectively, "Case 2 Defendants")[9] concerning the Browning Farm Lease. The Case 2 litigation resulted from the following events:

On October 4, 2022, the Browning Farm was conveyed to the Winkleblacks by the LLC. The Winkleblacks subsequently entered into a "Farm Lease" agreement with D&L Farming to farm the Browning Farm for a term from March 1, 2023 to December 31, 2025. The Farm Lease was signed by the Winkleblacks, and Edwards on behalf of D&L Farming.

Tenants alleged that "[o]n or around January 18, 2023, counsel for [Tenants] sent a letter to the Winkleblacks in order to share [Tenants'] contact information with the Winkleblacks," as they were the new owners of the Browning Farm. Tenants next alleged that "[o]n January 30, 2023, Defendants, through [Edwards] and [D&L Farming], told [Tenants] that they did not intend to honor the Browning [Farm] Lease and claimed (incorrectly) that the sale of the Browning Farm made the Browning [Farm] Lease null and void . . . ." It was further alleged that D&L Farming, "the purported tenant of the Browning Farm, notified [Tenants] of its intention to destroy [Tenants'] 2023 wheat crop so Defendant could prepare the Browning Farm for its 2023 crop." Tenants claimed they

---

[9] Tenants later voluntarily dismissed their claims against D&L Farming and Edwards, making the Winkleblacks the only defendants within Case 2 to be addressed here.

responded to this notice "with a second letter objecting to Defendants' Notice and demanding that Defendants confirm in writing that the Lease will be honored[,]" but, "[t]o date, have not received any confirmation that Defendants will honor the Browning [Farm] Lease."

Accordingly, Tenants filed the Case 2 petition, in which they brought three counts against the Case 2 Defendants: Count I: Breach of Lease – Specific Performance; Count II: Breach of Lease – Damages; and Count III: Prayer for Preliminary and Permanent Injunctive Relief.

Under Count I (Breach of Lease – Specific Performance), Tenants alleged the Lease for the Browning Farm is a valid and enforceable lease that provides for a five-year term. Tenants also alleged that they have fully performed their obligations under the Lease, but despite their full and complete performance, the Case 2 Defendants "have purported to terminate the Lease and have threatened to destroy Plaintiffs' 2023 wheat crop." Tenants alleged this was a material breach of the Lease and therefore requested a judgment ordering "Defendants specifically perform the Lease by providing [Tenants] with possession of the Browning Farm for the remainder of the term of the Lease and which awards [Tenants] their costs incurred herein and for such other and further relief as the Court deems necessary and proper under the circumstances." Tenants raised the same allegations in Count II (Breach of Lease – Damages) regarding the validity of the Lease, Tenants' performance under it, and the Case 2 Defendants' material breach of the Lease, but Tenants also included allegations that they "have incurred, and will continue to

9

incur, substantial damages resulting from Defendants' wrongful termination of the Lease." Tenants thus requested judgment "in an amount to be proven at trial, for pre-judgment and post-judgment interest at the highest rate allowed by law and which awards [Tenants] their costs incurred herein and for such other and further relief as the Court deems just and proper under the circumstances."

Under Count III (Prayer for Preliminary and Permanent Injunctive Relief), Tenants alleged they "are subject to immediate and irreparable harm if Defendants are not restrained and enjoined from terminating the Lease, removing [Tenants] from the Browning Farm and destroying [Tenants'] wheat crop." Tenants also alleged they "have no adequate remedy at law in that [Tenants] have invested substantial resources to the Browning Farm to prepare for the remainder of the Lease term[.]" Tenants therefore requested a preliminary and permanent injunction enjoining and prohibiting the Case 2 Defendants "from terminating the Lease, removing [Tenants] from the Browning Farm and destroying [Tenants'] wheat crop and which awards [Tenants] such other and further relief as the Court deems just and proper under the circumstances."

Shortly after the filing of the Case 2 petition, Case 1 and Case 2 were consolidated pursuant to a joint motion filed by Tenants and the Case 2 Defendants. In their answer, the Winkleblacks asserted the statute of frauds as an affirmative defense. The Winkleblacks claimed the Lease for the Browning Farm "does not satisfy the statute of frauds because it does not include an address or a legal description and lacks sufficient description of the land to be leased."

10

The Winkleblacks also included a two-count counterclaim (hereinafter, the "Winkleblacks Counterclaim"). Relevant here is Count 2 for "Declaratory Judgment Against Plaintiffs,"[10] which alleged the Browning Farm Lease did not satisfy the statute of frauds, meaning Tenants entered into a year-to-year lease with the LLC.[11] Accordingly, the Winkleblacks alleged a justiciable controversy exists regarding the rights and responsibilities of the parties, specifically as to whether the Lease for the Browning Farm satisfies the statute of frauds, and sought a "judgment finding [the Lease] did not satisfy the statute of frauds and consequently [Tenants] were on a year-to-year lease and were required to surrender possession of the Browning Farm by no later than February 28, 2023."

## C. Expert Affidavit

On or about June 30, 2023, Tenants disclosed and designated a licensed professional land surveyor and professional engineer ("Expert") as an expert witness as to the sufficiency of the descriptions in the Leases. Through an affidavit, Expert averred the following, uncontroverted facts.[12]

---

[10] The Winkleblacks later voluntarily dismissed Count 1 of their counterclaim, making Count 2 the only count within the Winkleblacks Counterclaim.

[11] The Winkleblacks also asserted a crossclaim against the LLC for breach of contract. The crossclaim specifically asserted this sale contract for the Browning Farm had represented said farm would be free from tenants after the 2022 harvest, would have no wheat planted on it, and would be farmed by the Winkleblacks for the 2023 season, where in fact Tenants remained in possession of the farm and have planted, and are currently farming, wheat, when the LLC was supposed to remove Tenants and their wheat from the Browning Farm. This crossclaim was later voluntarily dismissed without prejudice and thus is not at issue on this appeal.

[12] In their responses to Tenants' statement of uncontroverted material facts concerning Expert, the LLC and the Winkleblacks responded either "Admit," "Admit, but deny that the property is commonly known as the 'Browning Farm'. See Supplemental

11

Concerning the Browning Farm Lease, Expert was able to identify and locate the real estate subject to said Lease by utilizing the information contained in the Lease, namely, that 1) the owner of record is the LLC; 2) the property is located in Randolph County, Missouri; 3) the property is commonly referred to as the Browning Farm; and 4) the Lease was signed in 2021. Expert searched the Randolph County, Missouri Recorder of Deed's database for any property owned by the LLC during 2021. The search identified only one such property. Expert noted that the database also disclosed that the property owned by the LLC is described in the recorded warranty deed, and that this is the same property identified as the "Browning Farm" in Tenants' pleadings. Additionally, Expert reviewed the chain of title information provided through the same database and discovered that the original seller was identified as David Browning and Barbara Browning. Accordingly, "[b]ecause [the LLC] only owned one farm in Randolph County, Missouri during 2021 and because the chain of title reveals that the original seller was the Browning family, [Expert] was able to locate and identify the property referred to as the 'Browning Farm.'"

Similarly, with respect to the Higdon Farm Lease, Expert was able to identify and locate the real estate subject to said Lease by utilizing the information contained in the Lease, namely, that 1) the owner of record is the LLC; 2) the property is located in Howard County, Missouri; 3) the property is commonly

Affidavit of Michael Tregnago, ¶ 5," or "Admit, but deny that the property is commonly known as the 'Higdon Farm'. See Supplemental Affidavit of Michael Tregnago, ¶ 4."

referred to as the Higdon Farm; and 4) the Lease was signed in 2021. Expert searched the records in the Howard County Recorder of Deed's office for deeds indexed under "Higdon" for 2021. In doing so, Expert was able to locate and identify the property referred to as the Higdon Farm by locating the special warranty deed between the Higdon family and the LLC recorded in the real estate records of Howard County, Missouri. Additionally, Expert also searched the index for property owned by the LLC in Howard County, Missouri in 2021. The search identified only one such property, which was the same property identified in the above-mentioned special warranty deed. Therefore, "[b]ecause [the LLC] only owned one farm in Howard County, Missouri during 2021 and because the chain of title reveals that the original seller was the Higdon family, [Expert] was able to locate and identify the property referred to as the 'Higdon Farm.'"

**D. Summary Judgment Proceedings**

On August 31, 2023, Tenants filed a Motion for Summary Judgment. Within said motion, Tenants asserted "the sole issue here is whether the Higdon [Farm] Lease and the Browning [Farm] Lease comply with the statute of frauds." The motion argued that "the leases comply with the statute of frauds because they contain sufficient information to allow third parties to identify the farms at issue." In support thereof, the motion referred to Expert's affidavit, which "avers that [Expert] was able to locate the properties at issue using only the information in the leases." Tenants further asserted that "even if the testimony from [Expert] did not resolve the statute of frauds issue, the statute of frauds is satisfied via the doctrines

13

of promissory estoppel and partial performance." Lastly, the motion argued that "it is undisputed that the Tregnago Defendants signed the leases at issue and specifically understood what property was subject to the respective leases." Accordingly, Tenants requested summary judgment in their favor on Counts I and III of the Case 1 petition,[13] Count 2 of the Tregnago Counterclaim, Counts 1 and 2 of the Winkleblacks Counterclaim,[14] and the affirmative defense of the statute of frauds as asserted by all the defendants.

Subsequently, the LLC and the Winkleblacks filed their own joint motion for summary judgment. The motion argued there is no genuine issue of material fact that, as a matter of law, the "contracts" upon which Tenants based Counts I-III of the Case 1 petition and Counts I-III of the Case 2 petition fail to comply with the statute of frauds, "as they do not contain the essential terms of a contract and do not afford the means whereby the identification may be made perfect and certain by parol evidence." Similarly, the motion asserted "[t]he terms of the contracts at issue do not contain sufficient terms to be a guide to find the land and do not contain sufficient particulars to point out and distinguish the tract from any other in the area." The LLC and the Winkleblacks thus argued,

---

[13] Tenants' Motion for Summary Judgment generally refers to "Counts I and III of Plaintiffs' Petition," but does not specify whether it is the Case 1 or Case 2 petition. At the hearing on the motions for summary judgment, Counts I and III were described as breach of lease, specific performance and declaratory judgment, respectively. That description correlates with Counts I and III of the Case 1 petition, so we therefore presume this portion of the motion refers to said counts from the Case 1 petition.

[14] As previously stated, the Winkleblacks had already voluntarily dismissed Count 1 of their counterclaim by the time Tenants' filed this Motion for Summary Judgment. This was later recognized at the hearing on the motions for summary judgment.

The undisputed facts establish that Defendant[15] is entitled to summary judgment as a matter of law under the Missouri Statute of Frauds, as the contracts at issue are nothing more than oral year to year farm leases that can be terminated by giving sixty (60) days' notice before the end of the year under Section 441.050, RSMo., which such notice was given by the Defendant to the [Tenants] on August 1, 2022.

As such, the LLC and the Winkleblacks prayed for an order granting summary judgment in their favor and against Tenants on Counts I, II, and III of the Case 1 petition, Count 2 of the Tregnago Counterclaim, and Counts I, II, and III of the Case 2 petition. In relevant part, the LLC and the Winkleblacks also prayed for the following orders as part of the grant of summary judgment in their favor and against Tenants:

A. that the contracts upon which [Tenants] have filed suit are violations of the Missouri Statute of Frauds, Section 432.010, RSMo.;

B. that the notice given by Defendant to the [Tenants] on August 1, 2022, was sufficient notice under Section 441.050, RSMo.

C. [Tenants] to remove all of their crops, equipment, machinery, personal property of any kind, and the like from the property of both Defendants on or before January 1, 2024;

D. [Tenants] to be completely removed from the property that is the subject of [the Higdon Farm Lease] on or before January 1, 2024;

E. [Tenants] to be completely removed from the property that is the subject of [the Browning Farm Lease] on or before January 1, 2024.

After hearing on the motions for summary judgment, the trial court entered an "Order and Judgment" on December 7, 2023 granting the motion for summary

---

15 The motion referred to the LLC and the Winkleblacks collectively as "Defendant."

15

judgment filed by the LLC[16] and the Winkleblacks, and denying the motion filed by Tenants. Specifically, the trial court entered judgment in favor of "the Tregnago Defendants" and against Tenants on Counts I, II, and III of the Case 1 petition, and Count 2 of the Tregnago Counterclaim. With respect to the Winkleblacks, the court entered judgment in their favor and against the Tenants on Counts I, II, and III of the Case 2 petition, and Count 2 of the Winkleblacks Counterclaim. The court further entered judgment on the following:

A. finding that the contracts upon which [Tenants] have filed suit are violations of the Missouri Statute of Frauds, Section 432.010, RSMo. . . .

B. finding that the contracts upon which the [Tenants] have filed suit are oral year to year farm leases under Section 441.050, RSMo.;

C. finding that the notice given by Defendants to the [Tenants] on August 1, 2022, was sufficient notice under Section 441.050, RSMo.

D. ordering [Tenants] to remove all of their crops, equipment, machinery, personal property of any kind, and the like from the property of the Winkleblack Defendants (that is located in Randolph County and is the property referred to in [the Browning Farm Lease]) on or before January 1, 2024;

E. ordering [Tenants] to remove all of their crops, equipment, machinery, personal property of any kind, and the like from the property of the Tregnago Defendants (that is located in Howard County and is the property referred to in [the Higdon Farm Lease]) on or before January 1, 2024;

F. ordering [Tenants] to be completely removed from the property of the Winkleblack Defendants that is the subject of [the Browning Farm Lease] on or before January 1, 2024;

---

[16] Throughout its judgment, the trial court refers to the collective "Tregnago Defendants" rather than to the LLC individually. However, only the LLC joined the motion for summary judgment with the Winkleblacks.

16

G. ordering [Tenants] to be completely removed from the property of the Tregnago Defendants that is the subject of [the Higdon Farm Lease] on or before January 1, 2024.

H. this order and judgment is final for purposes of appeal and there is no just reason for delay, as this Order and Judgment disposes of a judicial unit of claims by resolving all claims against the Winkleblack Defendants, and also resolves a claim sufficiently factually distinct from the remaining claims.

. . . .

Tenants thereafter filed a Motion for New Trial and to Vacate Judgment. The trial court later held a hearing on the motion and denied same. Tenants then appealed the summary judgment determination.[17] The LLC and the Winkleblacks (collectively, "Respondents") responded by filing a joint Respondents' Brief.[18] The case is now before us.

**Mootness**

Before addressing the merits of Tenants' Points on Appeal, however, we must first consider Respondents' argument that the appeal filed by Tenants is now moot.

A threshold question in the appellate review of a controversy . . . is whether the matter has become moot due to subsequent events. *See State ex rel. Reed v. Reardon*, 41 S.W.3d 470, 473 (Mo. banc 2001). "In deciding whether a case is moot, an appellate court is allowed to consider matters outside the record." *Id.*; *Medlin v. RLC., Inc.*, 194 S.W.3d 926, 930 (Mo. App. 2006). An appeal is moot when a decision on the merits would not have any practical effect upon any then-existing controversy. *D.C.M. v. Pemiscot Cty.*

---

[17] As footnoted above, all other claims have been addressed by the trial court or voluntarily dismissed, leaving only the claims determined by summary judgment.

[18] While summary judgment was also granted in favor of Michael, Marc, and Heather Tregnago, those parties did not join in Respondents' brief nor did they file a separate Respondents' brief.

*Juvenile Office*, 578 S.W.3d 776, 780 (Mo. banc 2019); *In re Smith*, 351 S.W.3d 25, 26 (Mo. App. 2011).

*Riley v. Zoll*, 596 S.W.3d 654, 656 (Mo. App. S.D. 2020).

Respondents argue this appeal is moot because of actions taken by Tenants "which are inconsistent with the right of an appeal." Relying entirely on *Riley*, Respondents specifically contend that Tenants voluntarily acquiesced to the judgment by no longer being in possession of the property owned by the LLC, not planting any crops or tendering rent on said property, and not continuing in their efforts to post a bond. We disagree with this contention.

First, the record clearly reflects Tenants' pursuit of a stay of the judgment entered by the trial court. As discussed above, Tenants filed a Motion for New Trial and to Vacate Judgment following the trial court's summary judgment determination. After said motion was denied, Tenants filed in our court their Notice of Appeal and soon thereafter a Motion for Stay of Judgment Pending Appeal and for Leave to Post Supersedeas Bond, which requested that our court stay the enforcement of the trial court's judgment during the pendency of this appeal, thereby allowing Tenants to remain in possession of the properties upon posting a supersedeas bond.

Our court remanded Tenants' motion to the trial court "for a determination whether a supersedeas bond is appropriate to be issued in this matter, and if the circuit court determines such supersedeas bond is appropriate, the circuit court shall make a determination of the terms of such bond in accordance with Rule 81.09." A docket entry in the underlying trial court record shows that a hearing

18

was held with respect to the bond issue and resulted in the trial court deciding not to set a bond at that time. The next day, Tenants filed in our court a motion requesting that we clarify whether the trial court was required to rule on the merits of the Motion for Stay, or, in the alternative, that we grant the Motion to Stay. We ultimately denied both requests in an order dated February 26, 2024.

It is apparent from the aforesaid efforts of Tenants that they in no way acquiesced to the judgment or its order that they be removed from the properties. *Cf. Southern Mo. Dist. Council of the Assemblies of God, Inc. v. Kirk*, 334 S.W.3d 599, 603 (Mo. App. S.D. 2011) (appellant demonstrated its acquiescence in the judgment by failing to either "avail[] itself of the right to post a supersedeas bond pursuant to Rule 81.09" or "wait[] until execution had issued and then [seek] a stay pursuant to Rule 76.25"). Respondents criticize Tenants for not taking any *further* steps in pursuing a bond, but such criticism is clearly unfounded, especially considering Respondents cannot explain what such steps should have been.

Second, the present scenario is distinguishable from *Riley*. There, an appeal from a judgment in an unlawful detainer action was determined to be moot for two reasons, the first being that the appellants had voluntarily acquiesced in the judgment by surrendering possession of the farmland at issue. *Riley*, 596 S.W.3d at 656. Specifically, the respondents had stated in their brief that the appellants "vacated the farmland, removed their irrigation pump, planted no crops and tendered no rent for 2019." *Id.* These statements were supported by an affidavit, and the appellants offered no challenge to their accuracy. *Id.* Additionally, the

19

record in the underlying unlawful detainer action did not reveal that the respondents had utilized any legal process to remove the appellants from the farmland. *Id.* The second reason the appeal was moot was that the lease at issue had expired by its own terms on December 31, 2019, during the pendency of the litigation. *Id.* "Accordingly, [a] review of the trial court's judgment – which only decided who was entitled to immediate possession of the farmland in April 2019 – would have no practical effect upon an existing controversy." *Id.* (citation omitted).

Neither of these reasons are applicable here. As discussed above, it is evident from Tenants' post-judgment actions that they did not acquiesce in the judgment. Respondents here are also unlike those in *Riley* in that they provide *no* evidentiary support for their assertions that Tenants surrendered possession of the properties, have not planted any crops, and have not tendered any rent. Additionally, unlike the appellants in *Riley*, Tenants challenge the accuracy of Respondents' assertions. For example, in their reply brief, Tenants argue a crop they had planted and intended to harvest – until Respondents recently sprayed and killed it – remains on the Higdon Farm. Lastly, neither of the Leases have expired by their own terms, meaning our review of the trial court's summary judgment determination would have a practical effect upon an existing controversy. Moreover, even if the Leases had expired, Tenants also sought damages from Respondents for breach of the Leases, which would present a live controversy despite the Leases' expiration.

Thus, contrary to Respondents' argument, the present appeal is not moot. We shall therefore proceed to the merits of Tenants' Points on Appeal.

## Standard of Review

Our review is governed by the standard set forth by the Missouri Supreme Court:

> The trial court makes its decision to grant summary judgment based on the pleadings, record submitted, and the law; therefore, this Court need not defer to the trial court's determination and reviews the grant of summary judgment *de novo*.  In reviewing the decision to grant summary judgment, this Court applies the same criteria as the trial court in determining whether summary judgment was proper.  Summary judgment is only proper if the moving party establishes that there is no genuine issue as to the material facts and that the movant is entitled to judgment as a matter of law.  The facts contained in affidavits or otherwise in support of a party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion.  Only genuine disputes as to material facts preclude summary judgment.  A material fact in the context of summary judgment is one from which the right to judgment flows.
>
> ....
>
> The record below is reviewed in the light most favorable to the party against whom summary judgment was entered, and that party is entitled to the benefit of all reasonable inferences from the record.  However, facts contained in affidavits or otherwise in support of the party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion.

*Green v. Fotoohighiam*, 606 S.W.3d 113, 115-16 (Mo. banc 2020) (quoting *Goerlitz v. City of Maryville*, 333 S.W.3d 450, 452-53 (Mo. banc 2011) (abrogated on other grounds)).

"Generally, an order denying a party's motion for summary judgment is not a final judgment and is therefore not subject to appellate review." *Shelter Mut. Ins. Co. v. Hill*, 688 S.W.3d 638, 644 (Mo. App. W.D. 2024) (quoting *Columbia Mut.*

21

*Ins. Co. v. Heriford*, 518 S.W.3d 234, 238 n.2 (Mo. App. S.D. 2017)). "'Where, however, the material facts are undisputed and the merits of the denied cross-motion for summary judgment are inextricably intertwined with the issues raised in the granted motion for summary judgment, the merits of the denial of the cross-motion may be reviewed on appeal.'" *Niemuth v. Gaston*, 688 S.W.3d 51, 54 (Mo. App. S.D. 2024) (quoting *Boone Cnty. Fire Prot. Dist. v. City of Columbia*, 638 S.W.3d 555, 558 (Mo. App. W.D. 2021)).

### Points I and II

In Point I, Tenants argue the trial court erred in granting summary judgment in favor of the Defendants because they "were not entitled to judgment as a matter of law in that the uncontroverted material facts establish that the leases identify the farms included in each lease with reasonable certainty such that the statute of frauds is satisfied[.]" In Point II, Tenants claim the trial court erred in denying summary judgment in their favor because Tenants were entitled to judgment as a matter of law for the same reason asserted in Point I. Because the material facts are undisputed and the merits of the two motions are inextricably intertwined, we will review both the grant and denial of summary judgment. We therefore address Points I and II together.

Missouri's statute of frauds is found in section 432.010, RSMo. In relevant part, that section provides:

> No action shall be brought . . . upon any contract made for the sale of lands, tenements, hereditaments, or an interest in or concerning them, *or any lease thereof*, for a longer time than one year . . . unless the agreement upon

22

which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person by him thereto lawfully authorized . . . .

Section 432.010 (emphasis added). "Whether a writing satisfies the statute of frauds is a question of law." *Ahrens v. Dodd*, 863 S.W.2d 611, 613 (Mo. App. E.D. 1992) (citation omitted). "If a writing clearly fails to satisfy the statute of frauds, the party invoking the statute is ordinarily entitled to summary judgment." *Doss & Harper Stone Co. v. Hoover Bros. Farms, Inc.*, 191 S.W.3d 59, 62 (Mo. App. S.D. 2006) (citations omitted).

"A writing is sufficient to satisfy the statute of frauds if it sets forth the essential terms of the agreement including the parties, the subject matter, the consideration, the price and the promises upon both sides." *Seabaugh v. Sailer*, 679 S.W.2d 924, 926 (Mo. App. E.D. 1984) (citing *Ray v. Wooster*, 270 S.W.2d 743, 752 (Mo. 1954)). The essential term at issue here is the subject matter, i.e. the properties leased. In such situations, we find properties to be leased and to be sold are addressed in the same manner. "[I]t is well-settled law that the writing must describe the land being sold or leased." *Doss*, 191 S.W.3d at 62 (citation omitted). However,

> [T]he general rule has long been that "[t]he land need not be fully and actually described in the paper so as to be identified from a mere reading of the paper. But the writing must afford the means whereby the identification may be made perfect and certain by parol evidence."

*Id.* (second alteration in original) (quoting *Black v. Crowther*, 74 Mo. App. 480, 483 (1898)) (also citing *Herzog v. Ross*, 196 S.W.2d 268, 270 (Mo. banc 1946)). As declared by our Supreme Court,

23

> The law does not require that a contract for the sale of land shall in itself be wholly sufficient to identify the property. The writing is sufficient if it clearly reveals the intent of the parties with reference to the particular tract which is the subject matter of the sale and furnishes the means of its identification; or, as some cases hold, if it provides the "key" to the identification – the applicable principle being that that is certain which can be made certain.

*Ray*, 270 S.W.2d at 749 (citations omitted). Stated differently, "a court will not enforce a contract for the sale or long term lease of real estate unless the contract or a written memorandum thereof either definitely describes the land or clearly provides, *within itself*, the 'means' or 'key' by which the land can be identified with reasonable certainty." *Doss*, 191 S.W.3d at 63 (citations omitted).

"To determine certainty, the written instruments, together with the attending circumstances, are considered." *Seabaugh*, 679 S.W.2d at 926 (citing *Blankenship v. Porter*, 479 S.W.2d 409, 412-13 (Mo. 1972)). The "'key' or 'means' within the writing must be a reference 'to external standards in existence at the time and capable of being determined beyond dispute.'" *Doss*, 191 S.W.3d at 63 (emphasis removed) (quoting *Ray*, 270 S.W.2d at 749) (other citation omitted). "'The writing must be a guide to find the land and must contain sufficient particulars to point out and distinguish the tract from any other.'" *Id.* at 62 (quoting *Fox v. Courtney*, 20 S.W. 20, 21 (Mo. 1892)).

Critically, "[w]hen a seller of land owns only one estate which answers the description given in a memorandum, it must be taken to be the estate to which the memorandum refers." *Ray*, 270 S.W.2d at 751 (citation omitted). In fact,

> In some cases a description has been held sufficient even though it omits all reference to the state or county, municipality, section, township, or range, where it appears that the vendor owned a piece of land, and one only,

24

answering the specifications given; and especially is this true when the writing mentions ownership.

*Id.* at 750 (citations omitted). "If from the description given one may, with the aid of extrinsic proof not inconsistent with the writing, locate the property, the writing *must* be held to comply with the statute of frauds." *Id.* (emphasis added).

Here, the uncontroverted material facts demonstrate that both Leases contain, within themselves, "keys" or "means" by which the subject properties can be identified with reasonable certainty. Specifically, both Leases provide the identity of the then-owner of the property (the LLC), the county and State where the respective properties are located, the year in which the respective Leases were signed, and refer to the properties as the "Browning Farm" or "Higdon Farm", respectively. It is uncontroverted that in using this information, Expert was able to locate the subject properties through a public records search. Indeed, this search revealed that in 2021, the LLC only owned *one* property in Randolph County and *one* property in Howard County, the original sellers of which were the Brownings and the Higdons, respectively. Consequently, these respective properties *must* be the properties to which the respective Leases refer. *See Ray*, 270 S.W.2d at 751. *Cf. Williamson v. Burnett*, 345 S.W.2d 80, 83 (Mo. 1961) (finding a contract was specifically enforceable where "the description in the contract would enable a competent surveyor to find and identify the acre in question with the aid only of the description itself and of the extrinsic facts referred to in the contract"). As such, the Leases provide within themselves "keys" or

25

"means" by which the subject properties can be identified with reasonable certainty.

Nevertheless, despite *admitting* that Expert was able to locate the subject properties by utilizing the information in the Leases, Respondents maintain the Leases fail to satisfy the statute of frauds because the subject properties are much larger than the acreage listed in the respective Leases. Respondents argue there is nothing in the Leases identifying which portions of the properties are to be farmed and which portions are to be excluded, meaning "there is nothing in the subject leases that affords a means whereby identification of the land being leased can be made perfect and certain by parol[e] evidence." This argument is unpersuasive.

We first note that Respondents' contention is significantly undercut by their admission of the fact that by referring to the "Browning Farm" and the "Higdon Farm," both Tenants and the Tregnago Defendants understood what property was included in, and subject to, the Browning Farm Lease and the Higdon Farm Lease, respectively.[19] Respondents' argument is further undermined by their admission of the fact that rent was accepted by the Tregnago Defendants under the Browning Farm Lease for both 2021 and 2022, and under the Higdon Farm Lease for 2022.

Additionally, it is clear in examining the Leases that the parties intended the Leases to apply to the *entirety* of the respective farms. This is evident in the Leases referring generally to either the "Browning Farm" or "Higdon Farm." Further, *both* form leases include a provision stating "[t]he landlord reserves the right to use the

---

[19] *See supra* notes 2 and 5.

following land and buildings" and *both* such options to include landlord reservations are followed by the handwritten term, "N/A." Thus, no land or building on either farm is reserved for the benefit of "landlord," rendering the entirety of both farms subject to the lease. Further, and similarly, the Tenants' hunting rights are not limited to the tillable acres upon which the rent is calculated, but rather there is no geographical limit placed upon these hunting rights other than the boundaries of each, respective farm.

It is uncontroverted that the property subject to the Browning Farm Lease contains 141 acres – *not* just the 90-120 acres stated in the Lease – and that the property subject to the Higdon Farm Lease contains 138.87 acres, *not* just the "50/CRP" acres stated in the Lease. While the Browning Farm and Higdon Farm are each comprised of more acreage than the "more or less" range stated in their respective Lease, it is clear that such range refers only to those acres on the farms which are *tillable*. Indeed, elsewhere the Browning Farm Lease states that "[t]illable acres will be paid on. *More to be added as clearing happens*[,]" and the Higdon Farm Lease similarly provides that "[t]illable acreage will be figured by GPS." This, along with stating the rent per acre, is indicative of the *rent calculation model* agreed to by the parties, a matter no party challenges on appeal. This also distinguishes the present circumstances from the cases relied on by Respondents, where the writings at issue *explicitly exclude* certain portions of the subject property without providing a means to identify said excluded portions. *See Doss*, 191 S.W.3d at 63-64; *Peet v. Randolph*, 157 S.W.3d 360, 364 (Mo. App. E.D. 2005).

27

The Leases clearly satisfy the statute of frauds. Therefore, the Defendants were not entitled to judgment as a matter of law and the trial court erred in granting them summary judgment.[20]

Point I is granted. Because of our holding in Point I that the Leases satisfy the statute of frauds, Point II is also granted. Indeed, the trial court erred in denying Tenants' motion for summary judgment because the Leases satisfy the statute of frauds. Tenants were thus entitled to judgment as a matter of law. Due to our resolution of Points I and II, it is unnecessary to address Tenants' remaining Points.

---

[20] Notwithstanding the statute of frauds issue, it would still be necessary to reverse the grant of summary judgment in favor of Michael, Marc, and Heather Tregnago, as none of said parties sought summary judgment. "Under Missouri law, a circuit court has no authority to enter summary judgment for a non-moving party when the non-moving party does not file a cross-motion for summary judgment." *Moore v. Southwestern Bell Tel. Co.*, 684 S.W.3d 187, 211 (Mo. App. E.D. 2023) (citation omitted). "'Rule 74.04 emphasizes that a judgment should be entered if the *moving* party is entitled to a judgment as a matter of law.'" *Id*. at 212 (quoting *Betts-Lucas v. Hanson*, 31 S.W.3d 484, 486 (Mo. App. W.D. 2000)). "Rule 74.04 is replete with due-process protections because entry of summary judgment brings finality to a claim, and '[i]t is incumbent upon the parties seeking relief to initiate action through a motion because courts should not act on their own accord.'" *Id*. (alteration in original) (quoting *Betts-Lucas*, 31 S.W.3d at 486). For these reasons, the denial of a movant's motion for summary judgment against a non-movant does not establish grounds for granting judgment to the non-movant. *Id*. at 211 (citation omitted).

Here, Michael, Marc, and Heather Tregnago did not cross-move for summary judgment against Tenants, nor did they join the summary-judgment motion filed by the LLC and the Winkleblacks. As non-movants, the denial of Tenants' motion for summary judgment against them does not allow judgment to be granted in their favor. Accordingly, "[b]ecause the [trial] court cannot grant relief in the form of a final summary judgment that was not sought," the trial court erred in granting summary judgment to said defendants. *Moore*, 684 S.W.3d at 212 (citation omitted).

## Conclusion

For the foregoing reasons, the trial court's judgment is reversed. We remand with instructions that the trial court enter summary judgment in Tenants' favor on the statute of frauds issue and for further proceedings consistent thereon.

_____
W. DOUGLAS THOMSON, JUDGE

All concur.